DA 10-0613

IN THE SUPREME COURT OF THE STATE OF MONTANA

2011 MT 321

STATE OF MONTANA,

        Plaintiff and Appellee,

  v.

FLOYD THOMAS UPDEGRAFF,

        Defendant and Appellant.


APPEAL FROM:    District Court of the Fifth Judicial District,
                      In and For the County of Madison, Cause No. DC-2009-15
                      Honorable Loren Tucker, Presiding Judge


COUNSEL OF RECORD:

        For Appellant:

                Joslyn Hunt, Chief Appellate Defender, Garrett R. Norcott, Assistant
                Appellate Defender, Helena, Montana

        For Appellee:

                Steve Bullock, Montana Attorney General, Mark W. Mattioli, Appellate
                Services Bureau Chief, Rachel Batten, Legal Intern, Helena, Montana

                Chris Christensen, Madison County Attorney, Christopher McConnell,
                Deputy County Attorney, Virginia City, Montana


                      Submitted on Briefs:  December 7, 2011

                                  Decided:  December 20, 2011


Filed:

                         _____
                               Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 Late one night in July 2009, Jefferson County Reserve Deputy Francine Janik came upon a car parked in a posted "day use only" fishing access site in neighboring Madison County. The car's driver, Floyd Thomas Updegraff, appeared motionless and unresponsive. Janik approached the vehicle and made contact with Updegraff. Upon doing so, she ascertained that Updegraff was intoxicated. Janik detained Updegraff and radioed for assistance from a second Jefferson County officer, Deputy Michael Wharton. Wharton responded to the scene and placed Updegraff under arrest for driving under the influence of alcohol (DUI).

¶2 Updegraff subsequently was charged in the Fifth Judicial District Court, Madison County, with various offenses, including felony DUI (sixth offense). Before trial, he filed a motion to dismiss or, alternatively, to suppress the evidence against him on the ground that Deputy Janik and Deputy Wharton had effected an illegal arrest. The District Court held an evidentiary hearing and denied the motion. The case then proceeded to trial, and the jury ultimately convicted Updegraff.

¶3 On appeal, Updegraff raises one issue: whether the District Court erred in denying his motion to dismiss/suppress. His arguments in the District Court and this Court boil down to the following proposition: either the deputies were acting "under color of law" as Jefferson County "peace officers," in which case they had no authority to make an arrest in Madison County, or the deputies were acting as "private citizens," in which case they failed to comply with the mandates and limited authority of the private person arrest statute (§ 46-6-502, MCA). Either way, the arrest was illegal.

2

¶4     The State, on the other hand, argues the arrest was lawful. The State contends that Janik was "still a peace officer" when her duties brought her into Madison County and that her initial contact with Updegraff was justified under the community caretaker doctrine.[1] The State further contends that Janik's observations after making contact with Updegraff gave rise to "probable cause of a criminal offense involving an immediate, real danger to Updegraff and other motorists," thus meeting the arrest standard set forth in the private person arrest statute. Finally, the State acknowledges that Janik and Wharton followed certain "police procedures" in conjunction with Updegraff's arrest, but the State maintains that so-called "out-of-jurisdiction" peace officers are allowed to "employ their training, experience, and procedures when exercising citizen arrest authority."

¶5     These arguments implicate two questions in addressing the legality of Updegraff's arrest: what authority the deputies had to make a warrantless arrest in another county, and what restrictions applied to the deputies' actions incident to that arrest. As the State points out, we have held that a law enforcement officer is always a peace officer, no matter his or her geographical location. Yet, at the same time, we have also made it clear that, unless authorized by statute, a peace officer may not use criminal procedure statutes and does not have authority to make an arrest *in the capacity of a peace officer* when outside the territorial jurisdictional limits of the law enforcement entity for which the

---

[1] The community caretaker doctrine allows a law enforcement officer to effect a brief warrantless seizure of a person in order to check on the person's welfare. *See State v. Spaulding*, 2011 MT 204, ¶¶ 18, 21, 361 Mont. 445, 259 P.3d 793. Private citizens, conversely, are not subject to the warrant requirement, *see State v. Long*, 216 Mont. 65, 700 P.2d 153 (1985), and thus a private person would not need to invoke or satisfy the requirements of the community caretaker doctrine in order to make contact with a parked vehicle and check on the driver's welfare.

3

officer works. Instead, we have analyzed arrests by out-of-jurisdiction officers for compliance with the requirements of the private person arrest statute.

¶6 The assumption underlying this approach is that an out-of-jurisdiction officer "acts as a private citizen" and that the private person arrest statute, therefore, applies *wholesale* to the officer's actions. The parties' arguments and the events surrounding Updegraff's arrest, however, require that we address the correctness of this assumption. Following a detailed examination of the law of private person arrests, we conclude that the private person arrest statute applies only to arrests by actual "private persons" (i.e., non-peace officers) and those whose arrest authority is, by statute, limited to that of a private person. As such, it is necessary to clarify the analysis for arrests by out-of-jurisdiction peace officers. Based on the discussion below, and because it does not alter the outcome of this appeal, we hold that in order to make a warrantless arrest, an out-of-jurisdiction officer must meet the arrest standard that would apply to a private person in the same circumstances, but that if this standard is met, the officer may then follow the procedures applicable to peace officers in processing the arrest. Applying this approach here, we conclude that Updegraff's arrest was legal, and we accordingly affirm the District Court's denial of his motion to dismiss/suppress.

**BACKGROUND**

¶7 Deputy Janik is a retired Montana Highway Patrol officer. At the time of the events at issue here, she had served for ten years as a reserve officer with the Jefferson County Sheriff's Office. A "reserve officer" is "a sworn, part-time, volunteer member of a law enforcement agency who is a peace officer, as defined in 46-1-202, and has arrest

4

authority, as described in 46-6-210, only when authorized to perform these functions as a representative of the law enforcement agency." Section 7-32-201(6), MCA. The qualifications, training requirements, and limitations of reserve officers are set forth in §§ 7-32-213, -214, -216, and -217, MCA. Upon being activated by the chief law enforcement administrator of the local government, and while on assigned duty only, a reserve officer "is vested with the same powers, rights, privileges, obligations, and duties as any other peace officer of this state." Section 7-32-218, MCA.

¶8 Deputy Janik was on duty during the evening and early morning hours of July 11 and 12, 2009. At around 1:00 a.m., while patrolling on Highway 359 in Jefferson County between Cardwell and Interstate 90, she noticed a southbound vehicle that appeared to be speeding. Janik followed the vehicle, but the driver quickly slowed down. Thus, after crossing the Jefferson River into Madison County, Janik pulled into the Cardwell Bridge Fishing Access Site intending to turn around and return to Jefferson County.

¶9 As she made her turn, Janik's headlights illuminated a car parked on the roadway in the fishing access site. Because this is a posted "day use only" area, and thus nobody was supposed to be there at night, Janik decided to drive in and "make sure there was nothing going on that might need some attention." Based on what she had heard over the radio traffic that evening, Janik believed there were no Madison County deputies, Montana Highway Patrol officers, or Fish, Wildlife, and Parks officers in the area at the time. Thus, she did not contact any of these agencies regarding her situation. She did call in to the Jefferson County dispatcher, however, who noted "TS [traffic stop] @ Cardwell Fishing Access" on the dispatch logs at 1:13 a.m.

5

¶10     As she drove toward the parked vehicle, Janik could see that someone (Updegraff) was sitting in the driver's seat. His head was laid back against the seat, his eyes were closed, and Janik could see no movement. She shined her headlights into the vehicle, but Updegraff did not respond. She turned on her top red-and-blue rotating lights, but that also failed to rouse him. She approached the vehicle, announced that she was a deputy, and asked if he was alright. Still he did not respond. Janik then went up to the car door window, knocked on it very loudly, and again asked if everything was alright. Finally, Updegraff woke up. With slurred words, he stated, "Yeah, I think I'm alright."

¶11     Janik observed that Updegraff seemed disoriented and confused. She identified herself as a deputy and asked what he was doing there. Updegraff responded that he was "trying to do the right thing" and "sleep it off." He indicated that he was coming from Bozeman, had pulled off the road at Cardwell, and would be heading on to Butte. Through the windows of the vehicle, Janik observed "numerous, numerous beer cans." Some were open, others were in an ice cooler in back, and one was open in a cup holder next to the driver's seat. Janik could also see that his keys were in the ignition.

¶12     Janik asked Updegraff to step out of the vehicle. He complied. Janik smelled the "strong" odor of an alcoholic beverage emanating from both the car and Updegraff's person. She asked his name but was unable to understand his answer, so she asked for his driver's license, which he produced. Janik noted, though, that Updegraff had "a really tough time" finding his license in his wallet and that he fell back against the car when presenting it to her. His movements were "real staggery," and he had to use the car to keep himself up. His eyes were bloodshot and watery.

6

¶13    Updegraff refused to perform any field sobriety maneuvers.  He indicated that he wanted Janik to leave him alone so that he could "get on his way and go to Butte."  Since Updegraff was "such a large gentleman" and "very difficult to deal with," Janik radioed Deputy Wharton from her patrol vehicle and asked him to respond to the scene.  Janik noticed that Updegraff was shuffling through things in his car, so she returned to his vehicle to make sure that he was not drinking any alcohol or smoking any cigarettes.  She asked him to turn over his keys, which he eventually did.  Janik noted that one of his beer cans was now lying on the ground three feet from the driver's side door.

¶14    Deputy Wharton is a Jefferson County Deputy Sheriff.  He had been so employed for about two years by the time of this incident.  Upon arriving at the scene, Wharton observed Updegraff outside his car "walking around a little bit and kind of stumbling."  Wharton made contact with Updegraff and detected a distinct odor of an alcoholic beverage coming from Updegraff.  He also observed multiple beer cans in Updegraff's vehicle.  Wharton read Updegraff the implied consent advisory (*see* § 61-8-402, MCA) and asked him to provide a sample for a preliminary breath test.  Updegraff refused.  Wharton then handcuffed Updegraff and informed him that he was under arrest on suspicion of DUI.  While Wharton got Updegraff situated in his cruiser, Janik searched Updegraff's car and collected evidence therefrom.

¶15    Wharton transported Updegraff to the Jefferson County Sheriff's Office in Boulder.  This is approximately 33 miles north from the Cardwell Bridge Fishing Access Site.  On the other hand, Virginia City (the county seat of Madison County) is about 56 miles south from the fishing access.  Wharton conceded that he could have driven

7

Updegraff to Virginia City, but in the circumstances he believed it was proper to transport Updegraff to the nearest jail. At the Jefferson County detention facility, Updegraff refused to provide a sample for the Intoxilyzer. Wharton then issued him citations for various offenses, and Updegraff was processed into jail.

¶16 Madison County authorities were not immediately notified of Updegraff's arrest. He made his initial appearance the next day in Jefferson County Justice Court. It was not until July 23, 2009—eleven days after the arrest—that a Madison County official became involved in the case. On that date, the Madison County Attorney requested leave of the District Court to file an information charging Updegraff with DUI, possession of an open container, littering, and two drug-related offenses also arising out of the July 12 incident. The Jefferson County Attorney, correspondingly, filed a "Dismissal of Citations" in Jefferson County Justice Court on July 29.

¶17 At the hearing on Updegraff's motion to dismiss/suppress, the prosecutor assumed that because the events in question occurred in Madison County, the Jefferson County deputies acted as "private persons."[2] The prosecutor thus presented the District Court with a somewhat convoluted theory as to why Updegraff's arrest and transportation to Boulder were legal under the private person arrest statute, which provides as follows:

---

[2] Because we ultimately conclude below that the prosecutor's assumption was incorrect, we note here that "[w]e are not bound by a party's concession as to the meaning of the law, even if that party is the government and even in the context of a criminal case." *United States v. Ogles*, 440 F.3d 1095, 1099 (9th Cir. 2006) (en banc); *accord United States v. Miller*, 822 F.2d 828, 832 (9th Cir. 1987) ("Even if a concession is made by the government, we are not bound by the government's erroneous view of the law. The policy is longstanding and applied whether it is the government or a private party which has made the erroneous concession." (citation and internal quotation marks omitted)).

8

(1) A private person may arrest another when there is probable cause to believe that the person is committing or has committed an offense and the existing circumstances require the person's immediate arrest. The private person may use reasonable force to detain the arrested person.

(2) A private person making an arrest shall immediately notify the nearest available law enforcement agency or peace officer and give custody of the person arrested to the officer or agency.

Section 46-6-502, MCA.

¶18 Broken down into its constituent elements, the statute authorizes (a) an arrest, (b) by a private person, (c) when there is probable cause to believe that another person is committing or has committed an offense, and (d) the existing circumstances require the other person's immediate arrest; and the private person making the arrest (e) may use reasonable force to detain the arrested person, (f) must immediately notify (g) the nearest available law enforcement agency or peace officer and (h) give custody of the person arrested to the agency or officer. In attempting to fit the present arrest within these parameters, the prosecutor first argued that Janik and Wharton each had probable cause to believe that Updegraff had committed DUI, given their observations of his intoxicated condition, the strong odor of an alcoholic beverage, the numerous open beer cans strewn about his car, the keys in the ignition, and his admission that he was on his way from Bozeman to Butte. The prosecutor further argued that Updegraff's articulated desire to continue on his way gave the deputies grounds to make an immediate arrest.

¶19 The reasonableness of the force used had not been disputed by the defense, but satisfying the remaining elements of the statute presented a bit of a challenge. For one thing, the statute authorizes a private person to make "an arrest." It says nothing about the private person conducting the sort of DUI investigation that occurred here—i.e.,

9

asking Updegraff to perform field sobriety maneuvers, reading him the implied consent advisory, and asking him to provide a breath sample. Nor does the statute authorize the private person to conduct an automobile search or to collect evidence found therein. In this regard, the District Court expressed concern that allowing private citizens to conduct criminal investigations may implicate the arrestee's constitutional rights and would be "bad policy" in any event. Another problem in the statute's application was the deputies' apparent failure to "immediately notify the nearest available law enforcement agency or peace officer and give custody of the person arrested to the officer or agency." Section 46-6-502(2), MCA. It seems peculiar to question compliance with this requirement in the present case, where the two deputies *were* the nearest—and evidently only—peace officers available. It appears, however, that Updegraff, the prosecutor, and the District Court all assumed that "the nearest available law enforcement agency or peace officer" meant "the nearest available law enforcement agency or peace officer *within that jurisdiction*"—meaning, here, Madison County.

¶20 To get around these problematic aspects of the private person arrest statute, the prosecutor seized on language in *State v. Hendrickson*, 283 Mont. 105, 111, 939 P.2d 985, 988 (1997), where the Court stated: "Absent any exigent circumstances, when a citizen or out-of-jurisdiction peace officer, *acting as a citizen*, makes a stop or arrest, his or her authority to proceed ceases once a peace officer with jurisdiction arrives at the scene." (Emphasis in original.) Here, the prosecutor argued, the DUI investigation by Janik and Wharton, their search of Updegraff's car, their decision to transport him to Boulder rather than Virginia City, and their failure to immediately notify and give

10

custody of him to Madison County law enforcement were all justified under the so-called "exigent circumstances exception." The exigent circumstances cited by the prosecutor were the time of day, the location (being in the northernmost part of Madison County), and, especially, the lack of available Madison County officers in the area.

¶21 In response to these arguments, Updegraff maintained that it is illegal for a peace officer to make an arrest, in the capacity of a peace officer, outside his or her territorial jurisdiction, which seemingly is what transpired here. Updegraff also maintained that the private person arrest statute had not been satisfied. First, he contended that Janik needed to have probable cause of an offense in order to approach his parked vehicle in the first place. In his view, however, Janik did not have probable cause to believe that he was committing or had committed any offense until after she made contact with him. Second, regarding the deputies' actions incident to the arrest, Updegraff agreed with the court that it would be "bad public policy" for private citizens to be investigating traffic infractions. Moreover, he argued that the deputies had failed to comply with the requirements of immediate notification and transfer of custody, which could not be excused by "exigent circumstances." He noted that neither Janik nor Wharton had even attempted to get in touch with Madison County authorities before transporting him to Boulder.

¶22 The District Court ruled in favor of the State. The court first presumed that the Jefferson County deputies were "merely private citizens" while they were in Madison County. Proceeding on that premise, the court determined that Wharton's observations of Updegraff, the many containers of beer, the strong odor of alcohol, and the fact that he was parked some distance away from any town provided a sufficient basis upon which to

11

form probable cause of DUI, especially if considered together with Janik's observations.[3]

Next, the court concluded that Updegraff's expressed desire to drive away gave Wharton reason to make an immediate arrest. Also, the court noted that evidence of alcohol consumption in the bloodstream dissipates over time, and the court reasoned that in order to secure this evidence, it was necessary to take Updegraff into custody so that testing could be done without delay. Finally, as for the investigation and transfer-of-custody issues, the court found it troubling that the deputies had gone north to Boulder rather than south to Virginia City. The court also noted that the private person arrest statute does not authorize criminal investigations in conjunction with an arrest. However, the court read *Hendrickson* as allowing a private person to delay transfer of custody and to conduct an investigation if there are "exigent circumstances." Here, the court concluded, the lack of available Madison County officers in the area and the need to promptly test for alcohol concentration were exigent circumstances which justified the deputies in continuing to investigate and in transporting Updegraff to the Jefferson County Sheriff's Office.

¶23 The discussion then turned to the search of Updegraff's car. The prosecutor admitted uncertainty as to whether "the plain view doctrine," "inventory searches," and "searches incident to a lawful arrest" apply to arrests under the private person arrest statute. He elected, therefore, to dismiss the two drug-related charges that were

---

[3] The District Court indicated that it was uncertain whether a private person, when assessing probable cause to make an arrest under the statute, may rely on information provided by another. Subsequent to the District Court hearing, we issued our decision in *State v. Schubert*, 2010 MT 255, 358 Mont. 286, 244 P.3d 748. There, we held that the private person may consider information from a reliable third-party source, together with the facts and circumstances within the private person's own personal knowledge, in the assessment of probable cause under the statute. *See Schubert*, ¶¶ 17-22.

dependent on evidence which Janik had discovered and seized from Updegraff's car. The District Court granted the motion, and the case proceeded to trial on the DUI, littering, and open-container charges. Ultimately, the jury convicted on all three offenses.

## STANDARDS OF REVIEW

¶24    We review the denial of a motion to dismiss in a criminal case de novo. *State v. Hocter*, 2011 MT 251, ¶ 13, 362 Mont. 215, 262 P.3d 1089. We review a district court's ruling on a motion to suppress to determine whether its findings of fact are clearly erroneous and its interpretation and application of the law are correct. *State v. Hafner*, 2010 MT 233, ¶ 12, 358 Mont. 137, 243 P.3d 435.

## DISCUSSION

¶25    As an initial observation, treating the events described above as two "private persons" merely making an "arrest" is difficult to square with reality. Janik and Wharton were peace officers and conducted themselves as such. Janik activated her vehicle's top red-and-blue rotating lights and identified herself as a deputy. She directed Updegraff to get out of his car and to produce identification. She asked him to perform field sobriety tests and insisted that he turn over his keys. Wharton read Updegraff the implied consent advisory and asked him to provide a breath sample. Wharton handcuffed Updegraff, advised him that he was under arrest, and placed him in a patrol car. Meanwhile, Janik searched Updegraff's vehicle. Notwithstanding his articulated desire to continue on his way to Butte, Updegraff complied with all of the deputies' directions (other than their requests for a breath sample and field sobriety tests). It is questionable whether he would have been so compliant had these truly been "private persons."

13

¶26 The District Court endeavored to apply the private person arrest statute to these facts in accordance with *Hendrickson*. Understandably, the judge noted some difficulties with our jurisprudence in this area. The problem is that we have tried to fit a square peg (arrests by out-of-jurisdiction peace officers) into a round hole (the private person arrest statute). The fact is that § 46-6-502, MCA, was intended to apply to actual private persons, not sworn peace officers. In this regard, a brief historical account is required.

**Arrests by Private Citizens**

¶27 At common law, a private person had the power to arrest for felonies and breaches of the peace. *See United States v. Coplon*, 185 F.2d 629, 634 (2d Cir. 1950); *Crawford v. Commonwealth*, 44 S.W.2d 286, 288 (Ky. 1931); *Stevenson v. State*, 413 A.2d 1340, 1345-46 (Md. 1980); *Rohan v. Sawin*, 59 Mass. 281, 285 (1851); *State v. Mobley*, 83 S.E.2d 100, 102, 103-04 (N.C. 1954); *Brooks v. Commonwealth*, 61 Pa. 352, 358-59 (Pa. 1869). As noted in *Stevenson*, the right of private citizens to make arrests

> has its roots in the Statute of Winchester, enacted in 1285. This statute not only established the right of every person to apprehend malefactors in order to preserve the King's peace, but also imposed a positive duty on the people of England to drop whatever they were doing when the "hue and cry" was raised and to "join immediately in the pursuit." [M. Cherif Bassiouni, *Citizen's Arrest* 9 (1977).] Professor Wilgus vividly describes this early method of law enforcement: "When the cry of Out! Out! is heard, all must turn out with bows, arrows, knives, and shout and blow horns, from vill to vill. . . . The hand-having thief, or the red handed slayer with the gory knife in his hand, taken in hot pursuit, by those following the *hue and cry*, was still summarily disposed of; or if brought before any court was summarily hanged or beheaded, on proof that he was so taken under hue and cry, without any formal appeal or charge against him." [Horace L. Wilgus, *Arrest without a Warrant*, 22 Mich. L. Rev. 541, 545 (1924).] This differs little from what has been referred to in this country as lynch law.

413 A.2d at 1345 n. 5 (ellipsis and italics in original, some citations omitted).

¶28     Regarding felonies, the rationale for allowing arrests to be made without a warrant was that "dangerous criminals and persons charged with heinous offenses should be incarcerated with all possible haste in the interest of public safety," while arrests in misdemeanor cases involving breaches of the peace were justified by "the necessity for prompt on-the-spot action in suppressing and preventing disturbances of the public peace." *Mobley*, 83 S.E.2d at 102; *accord Carroll v. United States*, 267 U.S. 132, 157, 45 S. Ct. 280, 286 (1925); *see also Malley v. Lane*, 115 A. 674, 676 (Conn. 1921) (" 'The doctrine would seem to be that one who sees another committing a crime should do something to prevent it, or, failing in this, should bring him to justice.' " (citing Bishop, *New Criminal Procedure* vol. 1, § 171)).  It is important to note that the common law rules were developed at a time when "the apprehension of criminals by private individuals was the norm rather than the exception as it is today.  While '[t]he Crown appointed sheriffs and constables among whose manifold duties was that of arresting wrongdoers, . . . the principal burden of keeping the peace lay on the community as a whole.' " *Stevenson*, 413 A.2d at 1347 (brackets and ellipsis in original) (quoting Sam Bass Warner, *Investigating the Law of Arrest*, 31 J. Am. Inst. Crim. L. & Criminology 111, 112 (1940)).  Not only did private persons have the *right* to make an arrest, they had the *obligation* to do so in the case of felonies.  *See Kennedy v. State*, 6 N.E. 305, 307 (Ind. 1886) (" 'All persons whatsoever, who are present when a felony is committed, or a dangerous wound given, are obliged to apprehend the offender; otherwise they are liable to be fined and imprisoned for the neglect.' "); *Crawford*, 44 S.W.2d at 288 (" 'Any private person . . . that is present when any felony is committed is bound by the law to

15

arrest the felon on pain of fine and imprisonment if he escapes through the negligence of the standers-by.' "); *accord Brooks*, 61 Pa. at 358.

¶29 Montana's private person arrest statute is founded on the common law rules. *State v. Hum Quock*, 89 Mont. 503, 507, 300 P. 220, 221 (1931). The statutory authority for a private person to make an arrest in Montana has existed since territorial days. Section 64 of the Criminal Practice Act, passed by the legislative assembly in Virginia City on January 12, 1872, provided that an arrest could be made by a peace officer under a warrant, by a peace officer without a warrant, or by a private person. Sections 65 and 66 detailed the authority of a peace officer to make an arrest. Section 67, in turn, detailed the circumstances in which a private person could make an arrest: "First. For a public offence committed or attempted to be committed in his presence. Second. When he has reasonable cause for believing that a person has committed a felony, and that said person may flee before he can be arrested by a proper officer." Before making an arrest, the private person was required to "state to the person about to be arrested the cause thereof, and require him to submit, except when such person is in the actual commission of the offence, at the time thereof, or is in actual flight thereafter." Section 68. The private person was not to use any more restraint than necessary for the defendant's arrest and detention. Section 71. The private person was also required, "without unnecessary delay, [to] take him before a magistrate or deliver him to a peace officer." Section 69.

¶30 In 1895, the Legislature renumbered these sections and made some amendments not material to this discussion. The statutes were again renumbered for the 1907, 1921, and 1947 Codes. In 1967, the Legislature overhauled the criminal procedure laws and, of

16

relevance here, enacted the following private person arrest statute: "A private person may arrest another when: (a) He believes, on reasonable grounds, that an offense is being committed or attempted in his presence; or (b) When a felony has in fact been committed and he believes, on reasonable grounds, that the person arrested has committed it." Laws of Montana, 1967, ch. 196, § 1 (paragraph breaks omitted), *codified at* § 95-611, RCM, *derived from* former § 94-6004, RCM. This statute modified the law "by restricting the power of a private person to arrest to the two situations stated above. . . . The consensus of the commission was that modern law enforcement requires that most arrests be made by police officers and the right of private persons to arrest should be strictly limited." Commission Comments to § 46-6-502, MCA (2010 Annotations). Notably, the rule that the arrested person had to be brought before a judge without unnecessary delay was retained, but now it had to be a judge "in the same county." *See* § 95-901(b), RCM; § 46-7-101(2), MCA (1989). In addition, the option (under former § 94-6014, RCM) of delivering the arrested person to a peace officer, rather than a judge, was not retained.

¶31 In 1974, the Legislature added a subsection specifically authorizing a merchant to stop and temporarily detain a suspected shoplifter in the merchant's store. *See* Laws of Montana, 1974, ch. 274, § 3; § 95-611(3), RCM; §§ 46-6-502(3), -503(1), MCA (1989). The detention could last no more than 30 minutes, unless the person was arrested and turned over to the custody of a police officer. *See* § 46-6-503(2), MCA (1989); *but see Duran v. Buttrey Food, Inc.*, 189 Mont. 381, 393, 616 P.2d 327, 333 (1980) (holding § 46-6-503, MCA, unconstitutional insofar as it permits a merchant to stop and detain an individual suspected of shoplifting for up to 30 minutes without making an arrest).

17

¶32	The last significant amendments to the statutory scheme occurred in 1991. First, the felony/misdemeanor distinction and the "in his presence" language were deleted, as were the merchant-specific rules. In addition, the standard for believing that an offense has been or is being committed was restated as "probable cause" rather than "reasonable grounds," and the requirement that "the existing circumstances require the person's immediate arrest" was added. *See* Laws of Montana, 1991, ch. 800, § 40; § 46-6-502(1), MCA (2011). Elsewhere, the "same county" requirement for the arrestee's initial appearance was eliminated. *See* Laws of Montana, 1991, ch. 800, § 87; § 46-7-101(1), MCA (2011) (the arrested person "must be taken without unnecessary delay before *the nearest and most accessible judge* for an initial appearance" (emphasis added)). Similarly, provision was made for the arrestee to be delivered to a peace officer, instead of a judge. *See* Laws of Montana, 1991, ch. 800, § 40; § 46-6-502(2), MCA (2011) ("A private person making an arrest shall immediately notify *the nearest available law enforcement agency or peace officer* and give custody of the person arrested to the officer or agency." (emphasis added)).[4]

¶33	Based on this history of the common law rule and statutory scheme, we conclude that the purposes of the private person arrest statute are (1) to provide a mechanism

---

[4] It should be noted that there is no requirement in § 46-6-502(2), MCA, that "the nearest available law enforcement agency or peace officer" be "in the same county." And since the Legislature is clearly capable of using such language when it wants to—as the earlier versions of the statutes reflect—the parties and the District Court were mistaken in the assumption that a private person making an arrest under the statute must immediately notify and give custody to a law enforcement agency or peace officer "in the same county" as the arrest. Indeed, the fact that the initial appearance no longer has to be "in the same county" is further indication that there is not a "same county" requirement for notification and transfer of custody.

whereby a person, who is not a peace officer, may lawfully arrest another under the limited circumstances described in the statute and (2) to require that the nearest available law enforcement agency or peace officer immediately be given notice and custody of the arrestee. Importantly, the statute does not give the private person the right "to take the law into his own hands to redress his grievances." *Kroeger v. Passmore*, 36 Mont. 504, 510, 93 P. 805, 807 (1908); *cf. State v. Lemmon*, 214 Mont. 121, 128, 692 P.2d 455, 459 (1984) ("Vigilante days are over in Montana."). Nor does the statute authorize the private person to conduct forensic tests or searches or to otherwise "process" the arrestee, as those are strictly law enforcement functions. The statute contemplates a public safety purpose, not a criminal investigation purpose. It grants private persons the power to take another into custody in the interest of public safety, but mandates that the arrestee be promptly turned over to law enforcement, thereby allowing the normal processes and safeguards of the criminal justice system to take effect.

¶34 Given this purpose, it does not make sense to apply the statute to peace officers. In fact, the 1991 Commission Comments to § 46-6-502, MCA, state that the provisions allowing a warrantless arrest by a police officer are "parallel" to, but "distinct" from, those allowing an arrest by a private citizen. The requirement in the private person arrest statute that custody of the arrestee be given to "the nearest available law enforcement agency or peace officer"—regardless of whether the nearest agency or peace officer is on the other side of the county or city line—reflects the sound policy of getting the arrestee out of the private person's hands as soon as practically possible and into the hands of trained law enforcement personnel who are subject to constitutional and statutory

19

mandates in the processing of arrested persons. Not only does this protect the safety of the person making the arrest, it also protects the rights of the arrestee. Yet, if the arrest is made by a peace officer, and the arrestee is thus already in the custody of a peace officer, then the policy that would otherwise be served by the statute has already been fulfilled: need for an arrest in the interest of public safety has occurred, and the arrestee is under the control of the personnel responsible for processing the arrest.

¶35 For all of these reasons, we hold that the private person arrest statute (§ 46-6-502, MCA) applies only to arrests by actual "private persons" (i.e., non-peace officers) and those whose arrest authority is, by statute, limited to that of a "private person." *See e.g.* § 7-32-233, MCA ("An auxiliary officer has only the arrest authority granted a private person in 46-6-502.").

**Arrests by Out-of-Jurisdiction Officers: Caselaw**

¶36 The question remains as to the authority of an out-of-jurisdiction peace officer to make an arrest. The foundation of our present jurisprudence on this subject is *State v. McDole*, 226 Mont. 169, 734 P.2d 683 (1987). We followed *McDole* in *State v. Sunford*, 244 Mont. 411, 796 P.2d 1084 (1990), *Maney v. State*, 255 Mont. 270, 842 P.2d 704 (1992), *State v. Hendrickson*, 283 Mont. 105, 939 P.2d 985 (1997), and *State v. Williamson*, 1998 MT 199, 290 Mont. 321, 965 P.2d 231. Each of these decisions is discussed in turn below.

¶37 *McDole.* Eureka police received a report that McDole was driving erratically on a road near Eureka. The witness reported McDole as a possible DUI driver. A second witness reported that McDole had hit her vehicle while she was stopped at a stop sign in

the city limits and then had backed up and left the scene of the accident. A Eureka police officer drove to McDole's residence less than a mile outside the Eureka city limits. He confirmed that the truck in the driveway fit the description provided by the witnesses and that the truck hood was still warm. McDole came out of his residence, walked up to the officer with his hands in the air, appeared intoxicated, and said: "Take me! Take me!" The officer obliged, placed McDole under arrest, and took him to the station. *McDole*, 226 Mont. at 170, 172-73, 734 P.2d at 683-84, 685.

¶38 McDole argued that his arrest was illegal because it was made by a city police officer outside the city limits and without an arrest warrant. In addressing this claim, we acknowledged the "well established general rule that a law enforcement officer acting outside his jurisdiction without a warrant may not make arrests." *McDole*, 226 Mont. at 172, 734 P.2d at 685. But we noted that Montana recognizes exceptions to this rule and, hence, that "Montana no longer adheres to the old common law rule strictly prohibiting arrests outside an officer's jurisdiction." *McDole*, 226 Mont. at 172, 734 P.2d at 685. One exception to the general rule is § 7-32-4301, MCA, pursuant to which a city or town may authorize its police force to make arrests within five miles of the city or town limits.[5] Eureka, however, had not enacted such an ordinance. *McDole*, 226 Mont. at 171, 734 P.2d at 684. Accordingly, we considered a second exception: "the arrest made under circumstances which would authorize a private citizen to make the arrest." *McDole*, 226

---

[5] Section 7-32-4301, MCA, provided then, as it does now: "The city or town council has power to make regulations authorizing the police of the city or town to make arrests of persons charged with crime: (1) within the limits of the city or town; (2) within 5 miles thereof; and (3) along the line of water supply of the city or town."

Mont. at 172, 734 P.2d at 685. In this regard, we observed that an officer outside his or her jurisdiction has "all the arrest capabilities that a private citizen has"; thus, "if an arrest by a private citizen would be lawful under the existing circumstances, the arrest by an officer out of his jurisdiction would be lawful." *McDole*, 226 Mont. at 172, 734 P.2d at 685. Here, we reasoned, the private citizen who observed McDole's erratic driving could have arrested him under § 46-6-502, MCA (1985); the private citizen involved in the accident also could have arrested him under the statute; the arresting officer confirmed the citizen reports by positively identifying the truck, with its warm hood, involved in the erratic driving and accident; and the officer observed McDole step out of his house in an apparently intoxicated condition, hold out his hands, and state: "Take me! Take me!" Therefore, we concluded, "the trained Eureka police officer, armed with the citizen reports and his own observations, also had the authority to make the arrest in his capacity as a private citizen." *McDole*, 226 Mont. at 173, 734 P.2d at 685.

¶39 *Sunford.* We applied this logic to an airport security officer in *Sunford*. While a municipality or a county may appoint airport guards or police with full police powers, we noted that the jurisdiction of such officers extends only to enforcing ordinances, resolutions, rules, and orders enacted for the management, government, and use of the airport. *Sunford*, 244 Mont. at 414, 796 P.2d at 1085 (citing § 67-10-301, MCA). Thus, because the officer here had stopped and arrested Sunford for a traffic offense committed outside airport boundaries, we considered whether he had made a valid citizen's arrest. Based on the officer's observations that Sunford was speeding and, after being stopped, appeared to be intoxicated, we concluded the officer had reasonable grounds to believe an

22

offense was being committed in his presence. Thus, "[b]ecause a private citizen could have made a valid citizen's arrest under these circumstances," we held that the security officer, although acting outside his jurisdiction, had made a lawful arrest. *Sunford*, 244 Mont. at 415, 796 P.2d at 1086.

¶40 *Maney.* A Chinook police officer (Gomke) stopped Maney's vehicle about four and one-half miles outside the Chinook city limits. Because his breath smelled of alcoholic beverage, Gomke required Maney to perform field sobriety tests. Meanwhile, a Blaine County deputy sheriff (Kovacich) arrived on the scene and witnessed the sobriety maneuvers. Gomke and Kovacich agreed that Maney was impaired, so Gomke placed Maney under arrest and immediately notified the Blaine County Sheriff's Office that he had a DUI suspect in custody. Gomke then transported Maney to the Sheriff's Office in Chinook. Kovacich followed. Once there, Gomke re-administered sobriety tests while Kovacich observed. The tests again showed that Maney was impaired. When Maney refused Gomke's request to submit to a breathalyzer test, his driver's license was confiscated and suspended pursuant to § 61-8-402, MCA. *Maney*, 255 Mont. at 271-72, 842 P.2d at 705.

¶41 On appeal, the validity of the stop and Gomke's authority to make an arrest were not contested. Rather, Maney claimed his arrest was illegal because Gomke had not transferred custody of him to another officer. *Maney*, 255 Mont. at 274, 842 P.2d at 706. Recall that a year earlier, in 1991, the Legislature amended the private person arrest statute to include the requirements of immediate notification and transfer of custody. Importantly, Maney's argument depended on the premise that these procedures applied to

23

out-of-jurisdiction peace officers. The Court did not address this antecedent issue, however. It simply assumed the procedures applied. *Maney*, 255 Mont. at 274, 842 P.2d at 706 (applying § 46-6-502(2), MCA (1991)). The Court then reasoned that Gomke did not need to formally transfer custody in order to effectuate a valid citizen's arrest because "[a]s soon as Officer Gomke entered the Chinook city limits he was within his jurisdiction and it would make no sense to require Officer Gomke to transfer his prisoner to another officer who also had jurisdiction." *Maney*, 255 Mont. at 274, 842 P.2d at 706. Of course, the trouble with this analysis is that the statute contemplates immediate transfer of custody; it does not allow a private citizen to retain custody of an arrestee after a peace officer has arrived—a point we later discussed in *Hendrickson*. Here, a Blaine County deputy sheriff arrived on the scene in time to witness Maney perform sobriety maneuvers. The transfer of custody to the deputy could have, and presumably should have, occurred at this time—again, assuming this statutory requirement applied to Gomke in the first place.

¶42 **Hendrickson.** A Belgrade police officer (Woodland) was in Bozeman delivering a prisoner to the Gallatin County Detention Center when he noticed a motorcyclist who appeared to be having difficulty controlling his motorcycle. Woodland contacted the Bozeman Police Department and advised the dispatcher that he was following a possibly intoxicated driver. Woodland was told that he could make a traffic stop. Upon doing so, he approached the driver (Hendrickson) and asked a series of routine questions, including a request for registration, license, and proof of insurance. Woodland observed several factors indicative of intoxication, including slurred speech, a strong odor of alcohol, and

24

bloodshot eyes. Shortly thereafter, two Bozeman police officers (Keim and McManis) arrived on the scene. While Keim and McManis watched, Woodland had Hendrickson perform a series of field sobriety tests. Woodland then placed Hendrickson under arrest and transported him to the Detention Center. Once there, Woodland read Hendrickson the implied consent advisory and asked him to submit to a breath test. Hendrickson initially refused but later agreed to take the test. Although Keim and McManis were present, a Bozeman police sergeant authorized Woodland to write the citation charging Hendrickson with DUI. *Hendrickson*, 283 Mont. at 107-08, 939 P.2d at 986-87.

¶43    In addressing the lawfulness of these actions, this Court first held that "[u]nder § 46-6-502(1), MCA, Woodland was within his authority as a private citizen to observe Hendrickson's erratic driving, to perform the traffic stop as requested, and to relate his observations of Hendrickson's slurred speech, odor of alcohol and blood shot eyes." *Hendrickson*, 283 Mont. at 109, 939 P.2d at 987. The Court observed, however, that § 46-6-502(2), MCA, "requires a private citizen to immediately notify local authorities and relinquish custody to the officer or agency with jurisdiction." *Hendrickson*, 283 Mont. at 110, 939 P.2d at 988. Assuming again, without discussion, that this rule applied to out-of-jurisdiction officers, the Court concluded that the holding in *Maney* "is too broad in the scope of authority that it grants to a citizen's arrest pursuant to § 46-6-502, MCA. Absent any exigent circumstances, when a citizen or out-of-jurisdiction peace officer, *acting as a citizen*, makes a stop or arrest, his or her authority to proceed ceases once a peace officer with jurisdiction arrives at the scene." *Hendrickson*, 283 Mont. at 110-11, 939 P.2d at 988 (emphasis in original). Applying this rule, the Court held that

25

> Woodland exceeded his authority as a citizen when, after the arrival of the Bozeman police officers, instead of relinquishing custody to the officers, he conducted field sobriety tests, detained and arrested Hendrickson and requested that he submit to a breathalyzer. We conclude that any evidence obtained by Woodland (including the initial refusal and/or results of the breathalyzer test) after the police officers arrived was obtained illegally and must be suppressed as requested by Hendrickson.

*Hendrickson*, 283 Mont. at 111, 939 P.2d at 988-89 (expressly overruling *Maney* on this point). The Court noted that "there were no exigent circumstances requiring Woodland to engage in investigating and charging Hendrickson." *Hendrickson*, 283 Mont. at 111, 939 P.2d at 989.

¶44 ***Williamson.*** Lastly, *Williamson* involved another traffic stop and ensuing arrest by a Chinook police officer (Weber) outside the city limits. The stop was based on a citizen informant's report of a "possible drunk driver." *Williamson*, ¶¶ 3-5, 22. The initial question on appeal was whether this report alone was sufficient grounds for Weber to stop Williamson—a question that turned on the applicable standard. Ordinarily, an officer needs only particularized suspicion to make an investigatory stop. *Williamson*, ¶¶ 11, 13 (citing § 46-5-401, MCA). But Chinook had not extended the jurisdiction of its police to five miles beyond the city limits under § 7-32-4301, MCA, and thus "Weber was acting outside his jurisdiction as a City of Chinook police officer when he stopped Williamson." *Williamson*, ¶ 14. In this regard, the Court observed that since the scope of a peace officer's authority "is limited by the territorial jurisdictional limits of the law enforcement entity for which the officer works," *Williamson*, ¶ 15, an officer outside his or her territorial jurisdiction "may not use criminal procedure statutes expressly limited in application to 'peace officers,'" such as the investigatory stop statute with its

26

particularized suspicion standard, *Williamson*, ¶ 16. Yet, on the other hand, although an out-of-jurisdiction officer "is not authorized to make arrests in the capacity of a peace officer," *Williamson*, ¶ 15, the Court noted that the officer "may make an arrest under circumstances which would authorize a private citizen to do so," *Williamson*, ¶ 16. Thus, the Court held that Weber had to meet the "probable cause" standard of the private person arrest statute. *Williamson*, ¶¶ 16, 20; *see also State v. Reiner*, 2003 MT 243, ¶ 18, 317 Mont. 304, 77 P.3d 210. Ultimately, the Court concluded that Weber did not have probable cause to stop Williamson. *Williamson*, ¶¶ 35-36; *see also e.g. State v. May*, 2004 MT 45, ¶¶ 18-20, 320 Mont. 116, 86 P.3d 42.

¶45 **Summary.** In sum, *McDole* and its progeny stand for two key principles. First, the scope of a peace officer's authority is limited by the territorial jurisdictional limits of the law enforcement entity for which the officer works, which means an officer outside his or her territorial jurisdiction may not make arrests as a peace officer and may not use criminal procedure statutes expressly limited in application to "peace officers." Second, Montana recognizes two exceptions to this general rule: (a) an out-of-jurisdiction officer may use his or her authority as a peace officer if authorized to do so by statute[6] and (b) an out-of-jurisdiction officer may make an arrest under circumstances which would

---

[6] Aside from § 7-32-4301(2), MCA (granting a city or town council power to authorize arrests within five miles of the city or town limits), we note that § 44-11-101, MCA, provides, in part, that a peace officer or law enforcement entity of any county or municipality may request the assistance of a peace officer from another law enforcement entity within the State, and that a peace officer, while in the jurisdiction of the requesting officer or entity, and while on such request for assistance, "has the same powers, duties, rights, privileges, and immunities as a peace officer of the requesting entity." Also, we note that peace officers of another state, of the United States, or of the District of Columbia who enter Montana have the arrest authority granted by § 46-6-411, MCA.

authorize a private citizen to do so. We reaffirm these principles in the present case. In so doing, however, we note that while the first exception has not presented analytical problems, the second exception has resulted in some incorrect assumptions regarding the private person arrest statute. Because that statute, as explained above, was not intended to apply to sworn peace officers, it is necessary to address our discussions of the statute in *Maney*, *Hendrickson*, and *Williamson* and to clarify the authority of out-of-jurisdiction peace officers to make arrests under the second exception.

### Arrests by Out-of-Jurisdiction Officers: Clarification of Authority

¶46 As stated, a peace officer outside his or her territorial jurisdiction may make an arrest under circumstances which would authorize a private citizen to do so. Regrettably, this has been characterized inaccurately as "acting as a private citizen under the authority of § 46-6-502, MCA." *Hendrickson*, 283 Mont. at 109-10, 939 P.2d at 988; *see also Williamson*, ¶ 16 ("[A] peace officer such as Weber, when acting outside his territorial jurisdiction *and as a private citizen*, may arrest another under the citizen's arrest statute . . . ." (emphasis added)); *Maney*, 255 Mont. at 276, 842 P.2d at 707 ("Once Officer Gomke left his jurisdiction he could make arrests only *as a private person*." (emphasis added)); *McDole*, 226 Mont. at 173, 734 P.2d at 686 ("We conclude that the Eureka police officer, *acting in his capacity as a private citizen*, made a valid arrest of Mr. McDole." (emphasis added)). Based on this characterization, it was then assumed that an out-of-jurisdiction officer's actions must comply with the private person arrest statute *in toto*. Hence, given the statute's requirement of immediate transfer of custody, the Court in *Hendrickson* held that because Officer Woodland did not relinquish custody of

28

Hendrickson when the Bozeman police officers "with jurisdiction" arrived at the scene, any evidence obtained by Woodland from that point forward was obtained illegally and had to be suppressed. *Hendrickson*, 283 Mont. at 110-11, 939 P.2d at 988-89.

¶47 In retrospect, the problem with this holding is that the statute requires "[a] private person making an arrest" to immediately notify and give custody of the arrestee to "the nearest available law enforcement agency or peace officer." Section 46-6-502(2), MCA. As discussed, this requirement is designed to get the arrestee out of the private person's hands as soon as practically possible and into the hands of trained law enforcement personnel. There are no territorial jurisdictional requirements here; "nearest" available peace officer really does mean *nearest* available peace officer (*see* ¶ 32 n. 4, *supra*). Thus, because Hendrickson was already in the custody of the "nearest" available peace officer (Woodland), the purposes of the statute—taking a person into custody in the interest of public safety, and promptly turning that person over to law enforcement— were already fulfilled. Had Woodland truly been a "private person," then *Hendrickson*'s holding that he had to relinquish custody of Hendrickson immediately upon the Bozeman officers' arrival would make sense. But the holding does not make sense, and is not mandated by the statute, where the arrestee is already in the custody of a peace officer. The rule requiring transfer of custody was not intended to require the suppression of evidence, otherwise lawfully obtained, merely because the nearest available peace officer who takes custody of the arrestee, gathers evidence incident to the arrest, and processes the arrestee is a peace officer who happens to be outside his or her jurisdiction at the time. While there may be laws and protocols governing the transfer of custody of an

29

arrestee between peace officers of different jurisdictions and governing the authority of a peace officer to gather evidence and conduct investigations, the private person arrest statute is not one of them.

¶48 As a practical matter, the legal fiction that a sworn peace officer "acts as a private citizen" belies common sense. Obviously, peace officers do not suddenly forget all their training and experience simply because they cross an imaginary jurisdictional line in the sand. To the contrary, peace officers rely on their training and experience when rendering aid or addressing a potential threat to public safety, regardless of geographical location, as the officers' actions in *McDole*, *Sunford*, *Maney*, *Hendrickson*, *Williamson*, and the present case reflect. Furthermore, the notion that an out-of-jurisdiction officer acts as a "private citizen" is incongruous with the fact that a peace officer is *always* a peace officer. As we explained in *Maney*:

> A peace officer is "any person who by virtue of the person's office or public employment is vested by law with a duty to maintain public order and make arrests for offenses while acting within the scope of the person's authority." Section 46-1-202(17), MCA. A person who is employed as a law enforcement officer falls within this definition even when outside the geographical area in which the officer has jurisdiction. A person is a peace officer by virtue of holding the particular job. A law enforcement officer is in fact still a peace officer even when making an arrest under authority of the citizen's arrest statute.

*Maney*, 255 Mont. at 275, 842 P.2d at 707 (paragraph break omitted).

¶49 Addressing this point in *Williamson*, the Court observed that "[a] law enforcement officer is always a peace officer, no matter his or her geographical location, because the officer is always a person 'vested by law with a duty to maintain public order and make arrests for offenses.' " *Williamson*, ¶ 19 (quoting § 46-1-202(16), MCA (1993)). At the

30

same time, however, "an officer may only assert his or her authority as a peace officer when 'acting within the scope of [his or her] authority.' " *Williamson*, ¶ 19 (brackets in original) (quoting § 46-1-202(16), MCA (1993)).  The Court posited, therefore, that there is a distinction "between 'being' a peace officer and 'acting' as a peace officer; a law enforcement officer is a peace officer at all times pursuant to *Maney*, but may act as a peace officer only when acting within the scope of his or her authority."  *Williamson*, ¶ 19.  While the distinction between "being" a peace officer and "acting" as one might seem somewhat abstract, the critical point is simply this:  although a peace officer is always a peace officer, his or her *authority to act in that capacity* is restricted to the territorial jurisdictional limits of his or her employing agency (unless otherwise provided by law).  This does not mean, however, that the peace officer "acts as a private citizen" when making an arrest.  The assumption underlying the analyses in *Maney*, *Hendrickson*, and *Williamson* is that if a peace officer lacks authority to act in the capacity of a peace officer, then the only other alternative is that the peace officer acts in the capacity of a private person.  This is untrue.

¶50    Out-of-jurisdiction peace officers are in a category not specifically covered by any statutory provision.  On one hand, these individuals have no authority to make arrests in their capacity as peace officers (unless otherwise provided by law).  On the other hand, they are not truly "private persons."  To the contrary, they are "always" peace officers, no matter their geographical location.  Moreover, as already discussed, the private person arrest statute was not intended to apply to sworn peace officers.  Given the orphan status of these individuals, and absent legislative guidance on this issue, we will proceed to

31

apply the principle that "a peace officer acting outside the territorial limits of his [or her] authority does not have *less* authority to arrest than a person who is a private citizen." *People v. Wolf*, 635 P.2d 213, 216 (Colo. 1981) (emphasis added); *cf. McDole*, 226 Mont. at 172, 734 P.2d at 685 (an out-of-jurisdiction officer may make a warrantless arrest "under circumstances which would authorize a private citizen to make the arrest"); *Sunford*, 244 Mont. at 415, 796 P.2d at 1086 ("Because a private citizen could have made a valid citizen's arrest under these circumstances, the District Court did not err in concluding that the security officer, although acting outside his jurisdiction, lawfully arrested defendant."). This is not to say that the officer morphs into a "private person" acting under the private person arrest statute. It is only to say that if the circumstances would give a private person sufficient grounds to make an arrest, then the officer may do so as well. The statute merely supplies the standard necessary to make the arrest. At present, it is "probable cause to believe that the person is committing or has committed an offense and the existing circumstances require the person's immediate arrest." Section 46-6-502(1), MCA. Subsection (2)'s procedural requirements do not apply because the person making the arrest is a peace officer, not "[a] private person." In effecting the arrest, the officer is not precluded from conducting an investigation at the scene, gathering evidence, and transporting the arrestee to the nearest detention facility— functions the officer has been trained to do—provided that the officer abides by constitutional and statutory mandates applicable to warrantless arrests.

¶51    To recap, then, the private person arrest statute applies only to actual "private persons" (non-peace officers) and those whose arrest authority is, by statute, limited to

that of a "private person." The *Hendrickson* Court implied that there might be "exigent circumstances" where a private person would not need to comply with the requirements of the statute. This speculation was unnecessary, and we repudiate it. The plain language of the statute controls and must be followed.

¶52 Second, an out-of-jurisdiction officer is still a "peace officer"; the officer does not morph into a "private person." But because the officer is outside his or her territorial jurisdiction, the officer may not make an arrest in the capacity of a peace officer (unless otherwise authorized to do so by statute). The officer may make an arrest, however, if the circumstances would give a private person sufficient grounds to make an arrest, i.e., if there is probable cause to believe that a person is committing or has committed an offense and the existing circumstances require the person's immediate arrest. If this standard is met, the officer may follow the procedures applicable to peace officers in processing the arrest, and the lawfulness of the officer's actions in this regard will be judged under the constitutional and statutory rules applicable to peace officers.

¶53 This approach honors the purposes of the private person arrest statute and the jurisdictional limits of a peace officer's authority. It permits an out-of-jurisdiction peace officer to make an arrest if the circumstances would allow a private person to do the same, but it does not depend on the dubious fiction that the officer "acts as a private citizen." It recognizes that a law enforcement officer is always a peace officer; preserves the officer's ability to retain evidence of offenses that may be discovered in the course of processing the arrest; avoids application of procedural rules that were not designed to apply to peace officers; and leaves open the possibility that the Legislature may devise a

33

statutory scheme that specifically addresses the authority and limitations of a peace officer to act when outside his or her territorial jurisdiction.

**Analysis of Updegraff's Arrest**

¶54 As noted at the outset, our clarifications of the authority of an out-of-jurisdiction officer do not alter the outcome of this appeal. Indeed, it would be possible to conclude, based on *Hendrickson* (on which the District Court and the parties largely relied), that Updegraff's arrest was lawful under the private person arrest statute as follows: (a) there was an arrest; (b) the deputies were outside their territorial jurisdiction and, thus, were acting as private citizens; (c) there was probable cause to believe that Updegraff had committed an offense (DUI) based on the beer cans, his admissions, and the deputies' observations of his intoxicated condition; (d) the existing circumstances required Updegraff's immediate arrest given his intoxicated condition and his statement that he wanted to proceed on his way to Butte; (e) the deputies used reasonable force to detain Updegraff; and although they did not (f) immediately notify (g) an in-jurisdiction law enforcement agency or peace officer and (h) give custody of Updegraff to that agency or officer, these omissions are excused by exigent circumstances: the late hour, the fact that they were barely across the county line, and the lack of available Madison County officers in the area. For the reasons discussed, however, we no longer will follow this approach.

¶55 Instead, following the approach detailed above, Janik and Wharton were outside their jurisdiction and, thus, could not make an arrest in their capacity as peace officers. But they could make an arrest if the circumstances would have justified a private person

in making an arrest, i.e., if there was probable cause to believe that Updegraff was committing or had committed an offense and the existing circumstances required his immediate arrest. As a preliminary matter, we note that the Cardwell Bridge Fishing Access is under the control of and administered by the Montana Department of Fish, Wildlife, and Parks. *See* Admin. R. M. 12.8.107, 12.8.704. It is a posted "day use only" area. Thus, by being parked there at night, it seems that Updegraff was committing a misdemeanor. *See* §§ 23-1-102(4), -106, MCA. If so, Janik had probable cause of an offense upon seeing his parked car. The State, however, has not relied on this theory, and we accordingly do not base our holding on it. Rather, the State maintains that Janik's initial contact with Updegraff was justified under the community caretaker doctrine and that her subsequent observations gave rise to "probable cause of a criminal offense involving an immediate, real danger to Updegraff and other motorists."

¶56 The community caretaker doctrine permits a brief warrantless seizure of a person in order to check on the person's welfare. *State v. Spaulding*, 2011 MT 204, ¶ 18, 361 Mont. 445, 259 P.3d 793. As Updegraff pointed out in the District Court, this doctrine is applicable to peace officers, and *Williamson* held that out-of-jurisdiction officers cannot use criminal procedure laws that are expressly limited in application to "peace officers." Under the facts of the present case, however, we conclude that the community caretaker doctrine is not encompassed within *Williamson*'s holding.

¶57 As noted above (*see* ¶ 4 n. 1, *supra*), a private person does not need to satisfy the community caretaker doctrine in order to make contact with a parked vehicle and check on the driver's welfare. A private citizen, who is not subject to the warrant requirement

35

in the first place, may simply approach the vehicle and ask the driver if he or she needs assistance (assuming the private citizen is not otherwise trespassing). It would make little sense to hold that while a private person may conduct a welfare check on a parked vehicle, and while an in-jurisdiction peace officer may do the same if the criteria of the community caretaker doctrine are met, an out-of-jurisdiction officer may not approach the vehicle unless the officer has probable cause of an offense. We hold, therefore, that if the facts would justify an in-jurisdiction officer in contacting a parked vehicle under the community caretaker doctrine, then an out-of-jurisdiction officer may do the same.

¶58　Under the community caretaker doctrine, an officer may stop and investigate if there are objective, specific, and articulable facts from which an experienced officer would suspect that a citizen is in need of help or is in peril. *Spaulding*, ¶ 21. Here, Janik came upon a vehicle parked on the roadway in a public fishing access site marked "day use only." It was 1:00 in the morning. When she shined her headlights into the vehicle, the driver was motionless and unresponsive. She activated her overhead red-and-blue rotating lights, but that failed to rouse him. She approached the vehicle, announced that she was a Jefferson County deputy, and asked if he was alright. Still he did not respond. Under these circumstances, we conclude that Janik had objective, specific, and articulable facts from which an experienced officer would suspect that a citizen may be in need of help. Janik had reason to make further inquiry into the driver's welfare.

¶59　Janik made contact with Updegraff and initially observed the beer cans in his car, his slurred speech, his disorientation and confusion, his bloodshot and watery eyes, the odor of an alcoholic beverage emanating from the car and his person, and the keys in the

36

ignition. Updegraff admitted that he was on his way from Bozeman to Butte and that he was "trying to do the right thing" and "sleep it off." Updegraff had difficulties standing up outside the car and trouble finding his driver's license in his wallet. When Wharton arrived, he observed Updegraff "stumbling" around his car. Wharton smelled the odor of an alcoholic beverage coming from Updegraff and saw multiple beer cans in the car.

¶60    Probable cause to arrest is established if the facts and circumstances within the person's personal knowledge, or related to the person by a reliable source, are sufficient to warrant a reasonable person to believe that someone is committing or has committed an offense. *Williamson*, ¶ 12 (citing *Jess v. State*, 255 Mont. 254, 261, 841 P.2d 1137, 1141 (1992), and *State v. Schoffner*, 248 Mont. 260, 264, 811 P.2d 548, 551 (1991)); *see also State v. Schubert*, 2010 MT 255, ¶¶ 18-22, 358 Mont. 286, 244 P.3d 748. Here, the facts and circumstances observed by Janik gave her probable cause to believe that Updegraff had committed DUI. Likewise, the facts and circumstances observed by Wharton, together with the facts and circumstances related to him by Janik ("a reliable source"), gave Wharton probable cause to conclude the same. Updegraff's articulated desire to continue on his way in his intoxicated condition gave the deputies grounds to make an immediate arrest. Accordingly, we hold that the arrest was lawful.

¶61    Updegraff's only challenge regarding the events incident to his arrest is that the deputies failed to comply with, and exceeded the scope of, the private person arrest statute. As we have held, however, this statute does not apply here beyond supplying the "probable cause" standard for making the arrest, which the deputies satisfied. Updegraff presents no other ground for concluding that his arrest was unlawful.

**CONCLUSION**

¶62    The circumstances existing when Janik initially encountered and approached Updegraff's vehicle gave her sufficient grounds to conduct a welfare check. Janik's and Wharton's ensuing observations would have justified a private person in making an arrest. Thus, it was lawful for Janik and Wharton, acting as out-of-jurisdiction peace officers, to make an arrest. Accordingly, the District Court did not err in denying Updegraff's motion to dismiss/suppress.

¶63    In closing, we note that the Legislature could further clarify this area of the law by enacting statutes specifically dealing with the authority of out-of-jurisdiction officers to conduct investigations and arrests. Enactment of these statutes may clarify other potential problems, such as application of the workers' compensation laws and issues regarding liability.

¶64    Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ MIKE McGRATH
/S/ PATRICIA COTTER
/S/ BETH BAKER
/S/ JIM RICE
/S/ MICHAEL E WHEAT
/S/ BRIAN MORRIS