# FILED

August 23 2011

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

DA 10-0582

## IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2011 MT 204

STATE OF MONTANA,

Plaintiff and Appellee,

v.

ROSINA SPAULDING,

Defendant and Appellant.

APPEAL FROM:  District Court of the Twenty-Second Judicial District,
In and For the County of Carbon, Cause No. DC 10-16
Honorable Blair Jones, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Joslyn Hunt, Chief Appellate Defender, Eileen A. Larkin, Assistant
Appellate Defender, Helena, Montana

For Appellee:

Steve Bullock, Montana Attorney General, Jonathan M. Krauss,
Assistant Attorney General, Helena, Montana

Alex Nixon, Carbon County Attorney, Red Lodge, Montana

Submitted on Briefs:  August 3, 2011

Decided:  August 23, 2011

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1    Rosina Spaulding pleaded guilty in the Twenty-Second Judicial District Court, Carbon County, to misdemeanor DUI per se—i.e., driving or being in actual physical control of a noncommercial vehicle upon the ways of this state open to the public while the person's alcohol concentration, as shown by analysis of the person's blood, breath, or urine, is 0.08 or more. Section 61-8-406(1)(a), MCA. Spaulding reserved the right to appeal the District Court's denial of her motion to suppress. We affirm.

¶2    The parties raise two issues on appeal:

1.   Was Spaulding subject to a seizure?

2.   Did the community caretaker doctrine apply on the facts presented here?

### BACKGROUND

¶3    At approximately 1:25 a.m. on January 10, 2010, Deputy Jonathan Croft of the Carbon County Sheriff's Office was driving a marked patrol vehicle (a 2009 Chevy pickup) westbound on Selmes-Bridger Road between Bridger and Roberts, Montana. This is a dirt and gravel "back road" through a remote and sparsely populated area. There are few homes along the road and no businesses, other than the county salvage yard. There is very little traffic on the road during the wintertime, particularly at night. It was cold at the time—the wind was blowing and the temperature was in the 20s. Croft was officially on duty and wearing the uniform of a Carbon County Sheriff's Deputy.

¶4    As he was traveling along Selmes-Bridger Road, Croft observed the taillights of another vehicle roughly a quarter mile in front of him. The other vehicle was traveling somewhat slower than Croft's vehicle. When Croft was within about 200 yards of the

vehicle, the driver (Spaulding) activated her turn signal, moved to the side of the road, and came to a complete stop. She did so abruptly, not gradually, and Croft found the sudden stop to be unusual. In his experience, a driver on a county road will slow down and move over to the side to allow a faster moving vehicle, coming up from behind, to pass. He acknowledged that moving over to allow faster traffic to pass might have been a reasonable explanation for Spaulding's conduct, had he been closer to her vehicle at that point. But he did not recall having ever seen a vehicle pull over so abruptly and come to a complete stop when the overtaking vehicle was still 200 yards behind.

¶5 Croft had previously observed vehicles abruptly pull off to the side of the road due to a flat tire or engine troubles. Thus, he considered the possibility that the driver of the vehicle here might be experiencing mechanical difficulties and be in need of assistance. He also had encountered lost motorists in this area on prior occasions. In this regard, the vehicle's license plates indicated that it was from Stillwater County. Thus, because it appeared the vehicle was being driven by an out-of-area driver, using a road that is "in the middle of nowhere" and is "not a very well-travelled road," Croft considered the possibility that the driver was lost. He noted that the nearest residence was between a half mile and one mile behind, and the next residence was two miles ahead. Croft was unsure whether the driver might be trying to establish contact with him.

¶6 Croft slowed and pulled in behind Spaulding's vehicle. The State concedes that he had no particularized suspicion or reasonable grounds for an investigatory stop, as he had observed no erratic driving or traffic offenses, and he had no suspicion of any potential crime. *See Brown v. State*, 2009 MT 64, ¶ 20, 349 Mont. 408, 203 P.3d 842. Croft's stop

was premised solely on the following: the unusual manner in which the vehicle had abruptly pulled over and stopped, although he was still 200 yards behind; the conditions at the time (1:25 a.m. on a January morning, with the wind blowing and the temperature in the 20s, on a back road in a remote area); and his intent to rule out the possibility of a lost motorist, car trouble, or a medical emergency. As in all cases when he approaches a stopped vehicle, Croft considered the possibility that the occupants might have weapons or be engaged in criminal activity. In this regard, there had been some burglaries in the area recently. However, while he was concerned for his own safety, there was nothing to make him suspect any particular criminal activity. His main concern, and the reason he stopped, was to conduct a welfare check of the vehicle's occupants. (Spaulding had two passengers with her, which Croft observed by the time he stopped behind her car.)

¶7 Croft's vehicle had a front light bar across the top of the windshield, a grill light, and wig-wag lights in the headlights. There was also a rear light bar across the top of the rear windshield, which flashed red and blue lights, plus two alley lights on each side of the vehicle. During a normal traffic stop, Croft activates all of the emergency lights, which has the effect of automatically activating a camera in his vehicle and a microphone that he wears on his person. In this instance, as he pulled up behind Spaulding's vehicle, Croft activated only his overhead rear lights. He did not activate any of the other lights or the recording devices and did not inform dispatch that he was conducting a traffic stop. He was not planning to issue a citation. Croft's purpose was to "[c]heck to see if they were okay, if they needed anything. I would get them whatever they needed and if they didn't need anything, I was going on my way."

4

¶8      Croft made contact with Spaulding and explained who he was. He asked her if everything was okay, and Spaulding responded, "Yes. We're fine. Thank you." Croft could smell the odor of an alcoholic beverage coming from inside the vehicle. Spaulding concedes that after Croft made contact with her, he developed particularized suspicion to conduct a DUI investigation. Ultimately, Spaulding was charged with DUI. The issue in this case is whether Croft had a valid basis for making the initial welfare check under the community caretaker doctrine.

¶9      Spaulding appeared in Carbon County Justice Court and filed a motion to suppress all evidence obtained as a result of Croft's DUI investigation, on the ground that he lacked particularized suspicion to stop her and, thus, she had been unlawfully seized. Spaulding argued that the community caretaker doctrine did not apply. The Justice Court granted the motion. The State then appealed to the District Court de novo. The parties re-briefed the suppression issue. Following an evidentiary hearing, the District Court issued its findings facts and conclusions of law.

¶10     Given the circumstances existing at the time of the stop, the District Court found that Deputy Croft had objective, specific, and articulable facts to justify a concern that the occupants of the car may be in need of assistance. The court observed that the car had pulled over abruptly on a desolate rural road at 1:25 a.m. on a cold January day. As a law enforcement officer, Croft had previously observed vehicles pull over in the same abrupt manner due to engine trouble or a flat tire. Moreover, Croft had previously encountered lost motorists on remote county roads in this area. The weather was below freezing, there were no homes in the immediate vicinity, and this particular county road has very little

5

traffic in the early morning hours of a winter day. A stranded motorist, therefore, could be in a potentially perilous situation without ready access to assistance. Considering the time, the weather, and the remote location, the District Court found that Croft reasonably believed the conditions were potentially harmful to anyone stranded in the area.

¶11 Furthermore, the court observed that because it was too dark to make any observations through the window of his patrol car, Croft pulled in behind the stationary vehicle with the purpose of inquiring as to the occupants' well-being. And Croft did, in fact, inquire into Spaulding's welfare. If required, he was prepared to render assistance; if not, he was prepared to resume his patrol. The District Court noted that Croft's patrol vehicle was equipped with various emergency lights and that Croft routinely activated all of those lights when making a traffic stop. Here, however, he activated only his rear emergency lights, and the court found that Croft did so to warn any approaching motorists. The court observed that Croft activated neither his video recording device nor his audio recording device (which must be done manually when not all of the emergency lights are activated).

¶12 In light of the foregoing, and based on this Court's community caretaker caselaw, the District Court concluded that Croft took appropriate action based on articulable facts to ensure that Spaulding would have assistance if she needed it, and that his actions were consistent with a welfare check, not a traffic stop. The court stated that his actions "fit squarely within the ambit of the community caretaker doctrine" and, thus, did not amount to an unlawful seizure. Accordingly, the District Court denied the motion to suppress. Spaulding now appeals.

**STANDARD OF REVIEW**

¶13 We review a district court's ruling on a motion to suppress to determine whether the court's findings of fact are clearly erroneous and whether the court correctly interpreted and applied the law to those findings. *State v. Hafner*, 2010 MT 233, ¶ 12, 358 Mont. 137, 243 P.3d 435; *State v. Lewis*, 2007 MT 295, ¶ 17, 340 Mont. 10, 171 P.3d 731.

**DISCUSSION**

¶14 *Issue 1.  Was Spaulding subject to a seizure?*

¶15 The Fourth Amendment to the United States Constitution and Article II, Section 11 of the Montana Constitution protect individuals against unreasonable searches and seizures. Warrantless searches and seizures are per se unreasonable absent a few carefully drawn exceptions. *Lewis*, ¶ 21; *State v. Graham*, 2007 MT 358, ¶ 13, 340 Mont. 366, 175 P.3d 885.

¶16 As an initial matter, the State contends that a welfare check conducted under the community caretaker doctrine is not a seizure. We have suggested as much in some of our cases. *See e.g. State v. Lovegren*, 2002 MT 153, ¶¶ 16, 24-25, 310 Mont. 358, 51 P.3d 471; *State v. Seaman*, 2005 MT 307, ¶¶ 27, 30, 329 Mont. 429, 124 P.3d 1137; *State v. Wilkins*, 2009 MT 99, ¶¶ 6, 11-14, 350 Mont. 96, 205 P.3d 795. Based on *Lovegren*, ¶ 16, Spaulding likewise asserts that "[a] community caretaker stop does not involve a seizure." She therefore dedicates the vast majority of her arguments on appeal to establishing that she in fact was "seized" on January 10, 2010—evidently under the assumption that seizures and the community caretaker doctrine are mutually exclusive,

7

and that if she can show a seizure occurred here, then the community caretaker doctrine cannot apply. Spaulding argues that she was seized either because a reasonable person in the circumstances would have believed that he was not free to leave, *see State v. Merrill*, 2004 MT 169, ¶ 10, 322 Mont. 47, 93 P.3d 1227 (citing *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870, 1877 (1980)), or because Deputy Croft's objective actions restricted, interfered with, or deprived Spaulding of her liberty or freedom of movement, *see State v. Murray*, 2011 MT 10, ¶ 29, 359 Mont. 123, 247 P.3d 721 (McGrath, C.J., & Nelson, J., specially concurring) (proposing an alternate standard to replace *Mendenhall*'s "reasonable person" language).

¶17 In analyzing whether a seizure has occurred, a number of courts and jurists have criticized the "reasonable person"/"free to leave" standard articulated in *Mendenhall*.[1] One of the difficulties in inquiring whether a reasonable person would feel free to leave is that there is already a level of pressure or coercion to stay when an officer approaches and begins questioning. *See People v. Castigilia*, 915 N.E.2d 809, 812 (Ill. App. 2d Dist. 2009) ("[A] confrontation with a police officer is not a seizure on the basis that the

---

[1] *See e.g. Murray*, ¶ 28 (McGrath, C.J., & Nelson, J., specially concurring) (characterizing the standard as "impractical and unrealistic"); *United States v. Notorianni*, 729 F.2d 520, 522 (7th Cir. 1984) (noting that then-existing precedents, holding that an average person approached by a federal agent in an airport would "feel free to thumb his nose at the agent," may be "a wrong guess about what the average person feels in this situation"); *United States v. Williams*, 356 F.3d 1268, 1276 (10th Cir. 2004) (McKay, J., dissenting) (arguing that the "reasonable person" is a legal fiction historically defined by the minds and experience of judges, rather than the record at hand); *People v. Spicer*, 203 Cal. Rptr. 599, 602 (Cal. App. 2d Dist. 1984) (characterizing the notion that an individual is free to disregard an officer's questions and walk away as possibly "the greatest legal fiction of the late 20th Century"); *State v. Shy*, 373 So. 2d 145, 148 (La. 1979) (Dennis, J., dissenting) (criticizing the "free to walk away" standard as legalistic and unrealistic).

officer's authority produces an inherent pressure to cooperate.  Rather, . . . an encounter

between a police officer and a civilian 'is a seizure only if the officer *adds to those*

*inherent pressures* by engaging in conduct *significantly beyond* that accepted in social

intercourse.' " (emphases added) (quoting Wayne R. LaFave, *Search and Seizure* vol. 4,

§ 9.4(a), 425 (4th ed. 2004))).[2]  Moreover, as a result of post-*Mendenhall* jurisprudence,

> the hypothetical "reasonable person" carries a heavy, and at times perhaps
> even an intellectually debatable undue burden, in ensuring his or her
> individual liberties.  In interpreting the scope of the Fourth Amendment,
> courts appear to have steadily increased expectations that the "reasonable
> person" is one who not only knows the full extent of his rights, but
> zealously protects them to the point that he will not hesitate to confront
> authority and demand the return of identification so that he may effect his
> right to walk away.  Accordingly, one may reasonably inquire whether the
> "reasonable person" standard has in reality become the "reasonable person
> trained in the law" standard.  Indeed, if reasonable members of the public
> were asked whether they believed that they could terminate an encounter
> with a law enforcement officer by simply insisting that the officer return
> their license or identification, we suggest most would respond in the
> negative.  It is not unreasonable to think that only those versed in search
> and seizure law may fully understand that the ability of an officer to
> conduct an identification check is totally contingent upon the civilian's
> consent to the encounter where no reasonable suspicion of wrongdoing
> exists.

*Golphin v. State*, 945 So. 2d 1174, 1190 (Fla. 2006).

¶18     Yet, while there are legitimate criticisms of *Mendenhall*'s definition of "seizure,"

and while we believe the *Golphin* court's observations reflect reality, we need not resolve

in the present context whether *Murray* or some other approach would be preferable.  The

---

[2] *See also People v. Melton*, 910 P.2d 672, 676 (Colo. 1996) (noting that "citizens may feel an inherent social pressure to cooperate with the police"); *State v. Daniel*, 12 S.W.3d 420, 425 (Tenn. 2000) (same); *State v. Ashbaugh*, 244 P.3d 360, 375-76 (Or. 2010) (Walters, J., dissenting) (discussing social science research indicating that people believe they are required to cooperate with the police and are not free to leave when subjected to questioning).

community caretaker doctrine is operative where law enforcement initiates contact with a citizen, not to investigate the commission of a crime, but to investigate a potential vehicle accident or otherwise to ensure the safety of citizens. *Graham*, ¶ 25; *Seaman*, ¶ 15. In the usual case, a welfare check by its very nature necessarily involves a brief seizure— but a seizure nonetheless—in order for the officer to ascertain whether the citizen needs assistance or is in peril.[3] *Cf. Terry v. Ohio*, 392 U.S. 1, 16, 88 S. Ct. 1868, 1877 (1968) ("It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person."). As we clarified in *Graham*, the community caretaker doctrine is an exception to the warrant requirement for seizures, analogous to the *Terry* investigative stop. *See Graham*, ¶¶ 25-26. In the context of a *Terry* stop, the seizure is constitutionally "reasonable," notwithstanding the absence of a warrant, so long as the officer has a reasonable suspicion that the person may be involved in criminal activity and so long as the stop is limited in scope. *Hiibel v. Sixth Jud. Dist. Ct. of Nevada*, 542 U.S. 177, 185-86, 124 S. Ct. 2451, 2458 (2004); *see also Terry*, 392 U.S. at 20-30, 88 S. Ct. at 1879-84. The rationale for allowing the warrantless seizure is that "necessarily swift action predicated upon the on-the-spot observations of the officer on the beat . . . historically has not been, and as a practical matter could not be, subjected to the warrant procedure." *Terry*, 392 U.S. at 20, 88 S. Ct. at 1879. Analogously, if there are objective, specific, and articulable facts from which a law enforcement officer would suspect that a citizen needs help or is in peril, then the officer "may temporarily seize

---

[3] Given our holding here, we take this opportunity to reconcile our nonconforming jurisprudence. *See e.g. Lovegren*, ¶¶ 16, 24-25; *Seaman*, ¶¶ 27, 30; *Wilkins*, ¶¶ 6, 11-14.

[the] citizen, in the absence of a warrant or particularized suspicion, without running afoul of the prohibition against unreasonable searches and seizures contained in the Fourth Amendment to the U.S. Constitution or Article II, Section 11 of the Montana Constitution." *Graham*, ¶¶ 25-26. The criteria of the community caretaker doctrine (set out in full below), as well as its underlying rationale—namely, that a peace officer has a duty promptly to investigate situations in which a citizen may be in peril or need some type of assistance from an officer, *Lovegren*, ¶ 20—render the seizure constitutionally "reasonable," notwithstanding the absence of a warrant. In this respect, the *Terry* stop and the community caretaker stop are simply different branches of the same principle— both are constitutionally "reasonable" warrantless seizures because both are grounded in the officer's necessarily swift action or reaction to an on-the-spot situation, limited in scope to the purpose for which the stop is made.

¶19    There may be fact-specific situations in which a welfare check does not involve a seizure.[4] The present case, however, is not one of them. When Deputy Croft activated his overhead rear emergency lights, pulled in behind Spaulding's vehicle, and made contact with her, she was temporarily "seized" while Croft inquired as to her and her passengers' well-being. The critical question in these sorts of cases is whether the warrantless seizure was constitutionally "reasonable" because it met the criteria of the community caretaker doctrine—the question to which we now turn.

---

[4] For example, where the officer stops to make a welfare check on a car parked alongside the highway, but no one is in the car because the driver has left to get gas, there has been no seizure. But, if the officer observes contraband in plain view on the floorboard, this might give rise to particularized suspicion or probable cause to seize the car and its driver upon her return.

11

¶20   *Issue 2.  Did the community caretaker doctrine apply on the facts presented?*

¶21   "We use the following test to determine if the community caretaker exception to the warrant requirement applies in an encounter between government officials and citizens." *Graham*, ¶ 25.  First, as long as there are objective, specific, and articulable facts from which an experienced[5] officer would suspect that a citizen is in need of help or is in peril, then that officer has the right to stop and investigate.  Second, if the citizen is in need of aid, then the officer may take appropriate action to render assistance or mitigate the peril.  Third, once, however, the officer is assured that the citizen is not in peril or is no longer in need of assistance or that the peril has been mitigated, then any actions beyond that constitute a seizure which must be justified by something other than the community caretaker doctrine, such as particularized suspicion or probable cause. *See Lovegren*, ¶ 25; *Graham*, ¶ 25.  The issue in this case concerns the first prong of this test—i.e., whether there were objective, specific, and articulable facts from which Deputy Croft could suspect that a citizen was in need of help or was in peril.  Spaulding presents several arguments in this regard.

¶22   First, Spaulding argues that Croft's stop fails to meet the first prong of the test because the stop was not "wholly unrelated to" or "totally divorced from" the detection and investigation of crime.  She quotes this language from two observations made in our

---

[5] Consistent with our decision in *Brown v. State*, 2009 MT 64, 349 Mont. 408, 203 P.3d 842, the officer's experience and training "may be a factor in determining what sort of reasonable inferences he or she is entitled to make from his or her objective observations," but experience and training are not necessarily the defining element of the test. *Brown*, ¶ 20.  Courts must look to the facts and to the totality of the circumstances of each case. *Brown*, ¶ 20.

*Lovegren* decision: first, that " '[e]ncounters are initiated by the police for a wide variety of purposes, some of which are *wholly unrelated to* a desire to prosecute for crime,' " *Lovegren*, ¶ 16 (emphasis added) (quoting *Terry*, 392 U.S. at 13, 88 S. Ct. at 1876), and second, that " '[l]ocal police officers . . . frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, *totally divorced from* the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute,' " *Lovegren*, ¶ 17 (emphasis added) (quoting *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S. Ct. 2523, 2528 (1973)). Spaulding interprets these observations in *Lovegren* as placing a limitation on the application of the community caretaker doctrine, such that the doctrine applies only in those situations where the officer's subjective purpose for stopping was solely and exclusively to conduct a welfare check. Evidently, in Spaulding's view, if the officer also had even the slightest inkling that criminal activity might be afoot, then the community caretaker doctrine cannot apply and particularized suspicion for the stop is necessary. Here, she contends, Croft had a "two-fold motivation" in detaining her that included "his suspicion that Ms. Spaulding and her passengers might be committing or about to commit a crime in this area which had a history of burglaries." Therefore, Spaulding maintains, the stop cannot be justified as a community caretaker stop.

¶23 We reject this argument on both the facts and the law. For starters, throughout Spaulding's briefs on appeal, appellate counsel repeatedly mischaracterizes and distorts Croft's testimony, claiming that he "admitted he had a dual purpose in stopping and

13

investigating Ms. Spaulding." Croft did not testify that he stopped to investigate whether the occupants of the vehicle were committing a burglary or were involved in some other criminal activity. What he said was that he stopped to conduct a welfare check, given the weather, the time of day, the location, and the unusual manner in which the vehicle had pulled over. Then, as he approached the vehicle, Croft considered the possibility that the occupants might be dangerous or have weapons. As Croft specifically testified, his knowledge that there had been some burglaries in the area played no part whatsoever in his decision to stop. Rather, this knowledge was one of his concerns as he approached the vehicle, because "[a]ny time I make an approach, there are hundreds of things that are going through my mind that I've been trained to observe and look for." Indeed, we acknowledge, what should be obvious, that a law enforcement officer, by training, will approach a stopped vehicle cognizant and alert to the fact that the occupants may be armed and dangerous, and that the officer's wariness will vary depending on the facts and circumstances of each stop. Accordingly, the contention that Croft "considered [the burglaries in the area] *before* he stopped Ms. Spaulding" (emphasis added) and admitted to having a "dual purpose" in making the stop is inaccurate. The District Court, whose province it was to assess Croft's demeanor and credibility, *State v. Whiteman*, 2005 MT 15, ¶ 15, 325 Mont. 358, 106 P.3d 543, found that he "had the initial concern about [Spaulding] at heart" and did not use the community caretaker doctrine as a pretext for a criminal investigation.

¶24 More fundamentally, the requirements of the community caretaker doctrine are set out at ¶ 25 of *Lovegren*, and there is no requirement that the officer's subjective purpose

be solely and exclusively to conduct a welfare check. For that matter, in the same way that it is impractical to analyze a defendant's belief about whether she was free to leave, it is likewise impractical to assess the officer's subjective reasons for stopping and making contact with the defendant. It is true that the community caretaker doctrine cannot be used as a pretext for an illegal search and seizure. *Lovegren*, ¶ 23. For this reason, we require that a welfare check be based on objective, specific, and articulable facts from which an officer would suspect that a citizen is in need of help or is in peril, *Lovegren*, ¶ 25, and that the stop actually involve a welfare check, *see e.g. Graham*, ¶¶ 30-31 (the officer's admitted purpose was not to conduct a welfare check, but rather to "move [the defendant] along"); *State v. Reiner*, 2003 MT 243, ¶¶ 21-22, 317 Mont. 304, 77 P.3d 210 (the officer did not stop out of concern for the defendant being in peril or in need of assistance, but rather to commence an investigation based on a report of a possibly intoxicated driver); *Seaman*, ¶ 30 (the officer's initial questions reflected his concern for the defendant's well-being); *cf. State v. Nelson*, 2004 MT 13, ¶ 9, 319 Mont. 250, 84 P.3d 25 (even if the officer suspected that the defendant's license was suspended, the primary purpose of her stop was to determine whether any possible occupants of the vehicle needed assistance).

¶25    In the present case, there were objective, specific, and articulable facts from which an officer would suspect that a citizen was in peril or in need of help. The vehicle pulled over abruptly, while Croft was still 200 yards away. In Croft's experience, this indicated that the driver might have a flat tire or car troubles. They were on a back road in a desolate area, out "in the middle of nowhere," and the road was "not a very well-travelled

15

road." Moreover, the vehicle had out-of-area license plates, all of which indicated that the driver could be lost. It was 1:25 a.m. on a January morning. It was dark, the wind was blowing, and the temperature was below freezing. There were no homes in the immediate vicinity, and a stranded motorist would be in a potentially perilous situation. In these circumstances, it arguably would have been a dereliction of duty for Croft *not* to stop. *Seaman*, ¶ 15 ("Assisting a motorist in peril or in apparent need of aid is often viewed as an affirmative duty of the police and . . . it would be a dereliction of an officer's duty to walk away from an uncertain situation in which a motorist may be in need of help."). Croft did stop, activated only his rear emergency lights, made contact with Spaulding, and inquired as to her well-being.

¶26 Spaulding makes much of the fact that Croft activated his lights, as though this elevated the stop to something more than a welfare check. We disagree. It was necessary and prudent for Croft to activate his overhead rear emergency lights for multiple reasons. Most obviously, it alerted any motorist who might approach from behind to slow down and pass with care. In this way, the lights served a safety purpose and protected Croft, Spaulding, her passengers, and any passing motorist from injury. In addition, the lights, which Spaulding admittedly could see, provided some assurance that the approaching person was actually a law enforcement officer and not an imposter. Again, for Croft to have left his rear emergency lights off arguably would have been a dereliction of duty. The fact that he activated them did not, in itself, convert the situation from a community caretaker stop into an investigative stop. Indeed, that he turned on only his rear lights is evidence that this was in fact merely a welfare check, and not a full-blown traffic stop.

16

¶27 Next, Spaulding contends that Croft's stop fails to satisfy the first prong of the community caretaker test because, besides stopping to investigate whether the occupants of the vehicle were committing burglaries or other crimes (which is not actually why he stopped, as just discussed), Croft's only other motivation was "his 'extreme' practice of stopping and investigating everyone he sees who has pulled over and stopped on the side of a road." This is a reference to Croft's testimony in the District Court that he "always check[s] on a vehicle that pulls to the side of the road." Croft testified that he believes law enforcement is a community service profession and that much of his communication with the public is not premised upon the suspicion of or investigation of a crime. As a law enforcement officer, Croft stated that he has an obligation to provide aid to motorists that need assistance. To that end, Croft had a policy—which he acknowledged "might sound extreme"—of checking on any vehicle parked on the side of a road "under any circumstances," even if there is no evidence of wrongdoing, peril, or distress. Notably, the District Court questioned Croft about this practice and applauded his commitment to help people, but cautioned him that making a stop at every single vehicle pulled off to the side of the road might not comply with constitutional protections against unreasonable governmental interference. The District Court pointed out, correctly, that community caretaker stops "turn on the facts of each case" and require "objective, specific, and articulable facts" from which an officer would suspect that a citizen is in need of help or is in peril. We agree with the District Court's admonishment. Yet, while Spaulding opines that Croft's stop in her case was based on nothing more than his policy, the record belies this contention. The facts cited by Croft were objective, specific, and articulable

17

facts indicating that the occupants of the vehicle that had pulled over in front of him needed help or were in peril.

¶28 Lastly, Spaulding attempts to distinguish the present case from our decisions in *Lovegren*, *Nelson*, *Seaman*, *State v. Litschauer*, 2005 MT 331, 330 Mont. 22, 126 P.3d 456, and *State v. Wheeler*, 2006 MT 38, 331 Mont. 179, 134 P.3d 38, where we held that the community caretaker doctrine applied. She points out that she did not turn on her emergency flashers, that she did not flag down Croft, that she was not slumped over the steering wheel, that neither of her passengers acted like they were sick, that her car was still running and the lights were still on, that she was not outside the car holding on for support or exhibiting an emotionally excited appearance, that Croft had not received a report regarding an agitated citizen, and that Croft was not ignorant of how long her vehicle had been parked on the side of the road. Yet, the absence of such circumstances, while relevant, does not negate the objective, specific, and articulable facts which did exist: the cold winter weather; the remote and desolate location; the early morning hour; the unusual and abrupt manner in which Spaulding pulled over, which was indicative of a possible flat tire or car troubles; and the out-of-area license plate on a vehicle being driven on a back road with very little traffic, which was indicative of a possibly lost driver. Moreover, it was dark, which limited Croft's ability to assess whether assistance was required, thus necessitating that he stop and make contact with the vehicle's driver.

¶29 Each community caretaker case turns on its discrete facts. That a particular case is not, factually, a cookie-cutter copy of another simply proves this point. Given the foregoing factual circumstances of the present case, which are a quintessential example

of a situation to which the community caretaker doctrine applies, we hold that Croft was fully justified in conducting a welfare check.

## CONCLUSION

¶30    The District Court correctly denied Spaulding's motion to suppress.

¶31    Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ MICHAEL E WHEAT
/S/ BRIAN MORRIS