

DA 11-0304

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2012 MT 62

STATE OF MONTANA,

        Plaintiff and Appellee,

    v.

MICHELL L. ANDERS,

        Defendant and Appellant.

| | |
|---|---|
| APPEAL FROM: | District Court of the Tenth Judicial District, In and For the County of Fergus, Cause No. DC 2010-50 Honorable E. Wayne Phillips, Presiding Judge |

COUNSEL OF RECORD:

        For Appellant:

            Torger Oaas, Attorney at Law; Lewistown, Montana

        For Appellee:

            Steve Bullock, Montana Attorney General; Micheal S. Wellenstein, Assistant Attorney General; Helena, Montana

            Monte Boettger, Lewistown City Attorney; Lewistown, Montana

Submitted on Briefs: January 25, 2012

Decided: March 13, 2012

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Michell Anders (Anders) pled guilty to criminal possession of dangerous drugs, a felony, in violation of § 45-9-102, MCA, and possession of drug paraphernalia, a misdemeanor, in violation of § 45-5-207, MCA, and reserved her right to appeal the order of the Tenth Judicial District Court, Fergus County, denying her motion to suppress evidence, which she challenges on appeal. We affirm, and address the following issue:

¶2 *Did the District Court err by denying Anders' motion to suppress the evidence found within her purse on the basis of the community caretaker doctrine?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 At about 9:20 p.m. on July 4, 2010, an employee at The Movie Store in Lewistown called 911 to report that a woman was unconscious and lying face down on the floor of the store and was possibly intoxicated. Lewistown fireman and EMT, James Jensen, was the first emergency responder to arrive on the scene. Jensen rolled the unidentified woman over and determined that she was breathing, yet he was unable to rouse her. He checked her vital signs, including blood sugar level, which were within normal limits.

¶4 Minutes later, Sgt. Rick Miller and two other officers from the Lewistown Police Department and an ambulance crew headed by Paul Harchenko arrived on the scene. With the woman still unconscious and verbally unresponsive, Harchenko took charge of her care. He opened her eyes and shined a light on them—her eyes did not react, and her pupils were constricted. Harchenko testified that this was an abnormal reaction and that

2

constricted pupils commonly indicate the presence of opiates. The EMTs inserted an IV, and the woman was unresponsive to the placement of the needle. At the suppression hearing, Harchenko testified:

> At that point I did not know who the person was. I asked if there was anything around as far as identification. Somebody, one of the policemen, said that they had found a purse. I asked them if they could look in it and get a name, if there was any kind of medical information in there. Sometimes people will have a medication list of what medications they may take, what they might be allergic to, maybe if they are a diabetic, if they don't have a bracelet or necklace on maybe it is in their purse; just some information that would help me take better care of a patient that can't respond to me . . . . Hopefully there is medication bottles in there. If there is illicit drugs that doesn't matter to me at that point. I am just there to take care of the patient, but if there is something that they could have possibly taken that would change my course of care I want to know about it.

Harchenko further testified that he carries the medication Narcan, which reverses the effects of an opiate overdose but does not work to reverse the effects of nonopiate drugs.

¶5 No one at the scene could identify the woman, and Sgt. Miller located a purse sitting atop a movie rack, about 10 to 15 feet away from her. In response to Harchenko's request, Sgt. Miller opened the purse to look for identification and medical information. Sgt. Miller located a driver's license that provided a photograph that matched the woman and identified her as Michell Anders. He did not locate any explicit medical information but found other items potentially explanatory of Anders' condition. Inside the purse was a Crown Royal bag that did not appear to contain a liquor bottle. Sgt. Miller testified it is common knowledge to law enforcement officers that Crown Royal bags are often used to carry drugs or drug paraphernalia. He opened the bag and found some glass pipes with

3

what he suspected to be marijuana residue and small baggies containing a white residue he suspected to be methamphetamine. Sgt. Miller relayed this information to Harchenko.

¶6 Anders was placed in an ambulance and taken to the emergency room. To assist the hospital staff in providing aid to Anders, Harchenko reported her name and the items found within her purse. Sgt. Miller went immediately to the police station and field tested the substances, obtaining a positive result for methamphetamine.

¶7 At the hospital, the ER physician, Dr. McMahon, readied to take a urine sample from Anders to test for drugs present in her system so that a proper course of treatment could be determined. Before Dr. McMahon could draw the urine sample, Anders regained consciousness. She refused all medical treatment and promptly departed the hospital. A short time later, Sgt. Miller phoned the hospital to advise Dr. McMahon of the field test results for purposes of Anders' medical treatment. Before calling, Sgt. Miller did not know Anders had regained consciousness and left the hospital.

¶8 Based upon the evidence found in her purse, Anders was charged with criminal possession of dangerous drugs in violation of § 45-9-102, MCA, and possession of drug paraphernalia in violation of § 45-5-207, MCA. After pleading not guilty to both counts, Anders moved to suppress the evidence found in her purse, arguing it was obtained by an illegal search. The District Court denied her motion, citing the community caretaker doctrine. Anders pled guilty to the charges while reserving her right to appeal the ruling on her motion to suppress.

4

## STANDARD OF REVIEW

¶9 When reviewing a district court's ruling on a motion to suppress, we determine whether the findings of fact are clearly erroneous and whether the court correctly interpreted the law and applied it to those facts. *State v. Spaulding*, 2011 MT 204, ¶ 13, 361 Mont. 445, 259 P.3d 793 (citing *State v. Hafner*, 2010 MT 233, ¶ 12, 358 Mont. 137, 243 P.3d 435; *State v. Lewis*, 2007 MT 295, ¶ 17, 340 Mont. 10, 171 P.3d 731).

## DISCUSSION

¶10 *Did the District Court err by denying Anders' motion to suppress the evidence found within her purse on the basis of the community caretaker doctrine?*

¶11 The District Court ruled that "Officer Miller's search of Defendant's handbag in order to discover why she was unconscious was proper under the community caretaker doctrine, adopted by the Montana Supreme Court in *State v. Lovegren*, 2002 MT 153, 310 Mont. 358, 51 P.3d 471."

¶12 In *Lovegren*, we adopted the following test to determine if the community caretaker doctrine applies in an encounter between government officials and citizens.

> First, as long as there are objective, specific and articulable facts from which an experienced officer would suspect that a citizen is in need of help or is in peril, then that officer has the right to stop and investigate. Second, if the citizen is in need of aid, then the officer may take appropriate action to render assistance or mitigate the peril. Third, once, however, the officer is assured that the citizen is not in peril or is no longer in need of assistance or that the peril has been mitigated, then any actions beyond that constitute a seizure implicating not only the protections provided by the Fourth Amendment, but more importantly, those greater guarantees afforded under Article II, Sections 10 and 11 of the Montana Constitution as interpreted in this Court's decisions.

5

*Lovegren*, ¶ 25.

¶13    Our "community caretaking" cases have typically involved a stopped vehicle. *See e.g. State v. Spaulding*, 2011 MT 204, 361 Mont. 445, 259 P.3d 793 (during windy, below freezing conditions, car with out-of-area plates pulled over abruptly on a desolate back road, officer thought the motorist might be lost or in peril); *State v. Nelson*, 2004 MT 13, 319 Mont. 250, 84 P.3d 25 (during winter, officer came upon a truck on side of highway that was still running, motorist appeared to be passed out); *State v. Lovegren*, 2002 MT 153, 310 Mont. 358, 51 P.3d 471 (officer came upon a car pulled to the side of the road with its lights off and engine running, driver appeared to be sleeping). This case presents unique facts involving what would normally constitute a search of a purse. Other jurisdictions have adopted a medical emergency exception to the warrant requirement to address such situations, sometimes described as a "variant of the exigent circumstances doctrine." *People v. Wright*, 804 P.2d 866, 869 (Colo. 1991). A medical emergency exception to the warrant requirement is not recognized within our constitutional jurisprudence, but we find the reasoning expressed in these cases to be instructive in applying our community caretaker doctrine in this case.

¶14    In *Mincey v. Arizona*, 437 U.S. 385, 392-93, 98 S. Ct. 2408 (1978), the U.S. Supreme Court recognized that when police officers reasonably believe that a person is in need of immediate aid, the Fourth Amendment does not prohibit them from warrantless searches or entries because the "'need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.'"

6

*Mincey*, 437 U.S. at 392-93, 98 S. Ct. at 2413 (quoting *Wayne v. U.S.*, 318 F.2d 205, 212 (D.C. Cir. 1963)). However, the Supreme Court warned that a warrantless search must be "'strictly circumscribed by the exigencies which justify its initiation.'" *Mincey*, 437 U.S. at 393, 98 S. Ct. at 2413 (quoting *Terry v. Ohio*, 392 U.S. 1, 25-26, 88 S. Ct. 1868, 1882 (1968)).

¶15 State courts have approached the issue similarly. The Supreme Court of Colorado noted that "police officers have varied responsibilities and at times must obtain information for purposes unrelated to the detection of crime . . . even though incriminating evidence is inadvertently discovered as a consequence." *Wright*, 804 P.2d at 869. The rationale for the medical emergency exception "is that the need to protect or preserve life or avoid serious injury to another is paramount to the right of privacy and thus is justification for what would otherwise be an invalid search." *Wright*, 804 P.2d at 869-70. In *State v. Gilpin*, 836 S.W.2d 49, 53 (Mo. App. W. Dist. 1992), the court noted that "the warrant requirement is unsuited to the swift and informal responses needed in cases of medical emergency," citing to *Mincey*, 437 U.S. at 392-93, 98 S. Ct. at 2413. "There is a positive need to see if the person is carrying some indication of a medical history, the rapid discovery of which may save his life." *Gilpin*, 836 S.W.2d at 53 (citations and quotations omitted). Like the Supreme Court, state courts have cautioned about the scope of such an exception. "The scope of any exception to a warrant requirement, however, must be strictly circumscribed by a real exigency justifying the initiation of a warrantless intrusion, and the burden is upon the prosecution to establish

7

that any such intrusion was necessary under the circumstances of a particular case." *Wright*, 804 P.2d at 869 (citations omitted). In Virginia, which has adopted a community caretaker doctrine, courts have emphasized that, when determining the validity of actions taken pursuant to the doctrine, "[o]bjective reasonableness remains the linchpin . . . ." *Terry v. Commonwealth*, 474 S.E.2d 172, 174 (Va. App. 1996) (citation omitted).

¶16 Anders argues that, should the Court choose to adopt the medical emergency exception to the warrant requirement, the search of her purse was not justified under that exception. While we decline to adopt the exception, Anders also argues that the community caretaker doctrine is inapplicable. She offers that, since there were already two EMTs and one firefighter treating her, she was no longer in peril and did not need Sgt. Miller's assistance, citing *State v. Smith*, 2004 MT 234, 322 Mont. 466, 97 P.3d 567.

¶17 In *Smith*, officers responded to a complaint about a noisy party and were granted access to the apartment by a partygoer. After entering the apartment, an officer heard vomiting noises coming from a bathroom from which the party host had exited shortly before, closing the door behind her. Without knocking or inquiring, the officer entered the bathroom to determine if the occupant was in need of assistance. *Smith*, ¶¶ 3-4. He found an underage drinker, Smith, "hugging the toilet, with her head in the toilet bowl." *Smith*, ¶ 4. Smith was cited for minor in possession of alcohol. *Smith*, ¶ 4. We agreed with Smith that the warrantless search of the bathroom was not justified by the community caretaker doctrine because the circumstances did not justify an officer's belief that she was experiencing a life-threatening illness or that immediate assistance

8

was necessary. *Smith*, ¶¶ 13, 15. The officer could have knocked on the bathroom door and inquired as to Smith's condition. We held that, "[i]n the absence of objective, specific and articulable facts supporting the conclusion that Smith was in need of officer assistance, we decline to invoke the community caretaker doctrine under these circumstances." *Smith*, ¶ 15.

¶18 Anders' situation is starkly contrasted from the situation in *Smith*, and we agree with the State that the first prong of the *Lovegren* test is satisfied here. Anders was unconscious and lying face-down on the floor of a movie store, a public place. Emergency personnel responded to a 911 call from a store employee to assist Anders in her obvious peril, and officers did not respond because of any reported criminal activity. There were objective, specific, and articulable facts that Anders was "in need of help or [was] in peril." *Lovegren*, ¶ 25.

¶19 As to the second prong, Sgt. Miller took "appropriate action to render assistance or mitigate the peril." *Lovegren*, ¶ 25. As noted above, the EMTs testified that they needed to obtain identifying or medical information in order to render proper care. Harchenko testified that determining whether Anders had used an opiate was important in deciding whether to utilize a reversal drug. He asked officers to look inside the purse. While we have recognized that "'[i]t would be difficult to define an object more inherently private than the contents of a woman's purse,'" *State v. Hamilton*, 2003 MT 71, ¶ 23, 314 Mont. 507, 67 P.3d 871 (citing *State v. Johnson*, 645 P.2d 63, 64 (Wash. 1982))," under these

9

circumstances, with Anders in peril, Sgt. Miller took appropriate action in an effort to render assistance and mitigate her peril.

¶20   Anders remained unconscious and was transported for emergency care to the hospital.  Sgt. Miller immediately performed field testing on the white powder and was unaware that Anders had regained consciousness and refused treatment until he called the hospital to report the results.  Consequently, Sgt. Miller did not violate the third prong of the test, and his actions did not render seizure of the evidence unlawful.

¶21   We conclude that police acted appropriately under the standards we have adopted for application of the community caretaker doctrine and that the evidence in Anders' purse was therefore properly obtained.

¶22   Affirmed.


/S/ JIM RICE

We concur:

/S/ MIKE McGRATH
/S/ PATRICIA COTTER
/S/ JAMES C. NELSON
/S/ MICHAEL E WHEAT