FILED

07/05/2022

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 20-0390

DA 20-0390

IN THE SUPREME COURT OF THE STATE OF MONTANA

2022 MT 131

STATE OF MONTANA,

      Plaintiff and Appellee,

   v.

JASON AARON CARRYWATER,

      Defendant and Appellant.

APPEAL FROM:   District Court of the Seventeenth Judicial District,
In and For the County of Blaine, Cause No. DC 2019-11
Honorable Yvonne Laird, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

         Jeff N. Wilson, Office of the Public Defender, Missoula, Montana

      For Appellee:

         Austin Knudsen, Montana Attorney General, Cori Losing, Assistant
Attorney General, Helena, Montana

         Kelsie Harwood, Blaine County Attorney, Chinook, Montana

Submitted on Briefs:  April 20, 2022
Decided:  July 5, 2022

Filed:

_____
Clerk

Justice James Jeremiah Shea delivered the Opinion of the Court.

¶1 Defendant Jason Aaron Carrywater appeals the February 3, 2020 Order by the Seventeenth Judicial District Court, Blaine County, denying his motion to suppress. We reverse and restate the issue on appeal as follows:

*Whether Sergeant Roberge had particularized suspicion to justify extending the traffic stop into a drug investigation.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 Blaine County Sheriff's Sergeant Joshua Roberge was parked while on patrol around 1:00 a.m. on April 27, 2019, when he recognized a driver, Clayburn Grant, pull into the parking lot of the E Z Mark Casino in Harlem. Sergeant Roberge observed Grant and a passenger, Carrywater, exit the car and enter the casino together. Sergeant Roberge knew Grant and Carrywater from his previous employment with the Fort Belknap Police Department, and he was aware of an active warrant for Grant's arrest and that Grant did not have a valid driver's license.

¶3 Sergeant Roberge confirmed with dispatch that the vehicle was registered to Grant. While awaiting confirmation on the warrant and Grant's license status, the two men and a woman exited the casino and Grant drove to a nearby ATM. Sergeant Roberge briefly lost sight of Grant's vehicle as he turned his patrol car around and he did not see the vehicle leave the ATM. After observing the vehicle turn onto U.S. Highway 2, Sergeant Roberge initiated a traffic stop. The driver signaled and the car traveled for about 600 feet before coming to a stop on the shoulder.

2

¶4     Before leaving his patrol car, dispatch informed Sergeant Roberge that Grant's warrant was non-extraditable in Blaine County. At the suppression hearing, Sergeant Roberge testified that, as he approached the driver's window, he expected to find Grant in the driver's seat and was surprised to see Carrywater behind the wheel. Sergeant Roberge promptly advised Grant about the warrant and told him that he was not going to arrest him. Sergeant Roberge then asked Carrywater for his license and the car's registration and proof of insurance. Grant admitted he did not have insurance. As Grant searched the glove compartment for his registration card, Sergeant Roberge returned to his patrol car to run Carrywater's license. Carrywater's license was valid.

¶5     Sergeant Roberge testified that, at this point, his "reason for remaining on the stop was at some point and time they switched drivers." Sergeant Roberge testified that he had also made several immediate observations that further informed his suspicion the men were involved in criminal activity: (1) the vehicle did not immediately stop upon initiation of the patrol car's emergency lights; (2) Carrywater's lower jaw would often protrude to one side of his face, which he believed could be indicative of methamphetamine use; and (3) Carrywater and Grant appeared "nervous, fidgety, a little uneasy." On cross-examination, Sergeant Roberge conceded that a car traveling at 60 m.p.h. would cover his reported stopping distance of 600 feet in only about six seconds; a protruding lower jaw is not a "solid" indicator of active methamphetamine use; and it is normal for people to be fidgety and nervous around law enforcement. Sergeant Roberge testified that, while none of his initial observations alone established criminal activity, when combined, they were "possibly indicative of criminal activity."

¶6    Sergeant Roberge returned Carrywater's license, asked him to step out of the car, and walked him to the rear of the vehicle. Carrywater complied. Sergeant Roberge asked Carrywater "where they were coming from [and] where they were going," to which Carrywater replied that they had traveled the approximately 30 miles from Hays to Harlem to go to the casino, that they were inside for about 45 minutes, and they were headed home. Carrywater told Sergeant Roberge that he was driving Grant's car because Grant had asked him to drive. Sergeant Roberge commented that he smelled alcohol on Carrywater's breath and Carrywater admitted he had one beer earlier that evening. Sergeant Roberge asked Carrywater if there were any drugs, drug paraphernalia, or weapons in the vehicle, all of which Carrywater denied.

¶7    After questioning Carrywater, Sergeant Roberge directed him to remain behind the vehicle and walked to the front of the car to ask Grant a similar series of questions. Grant stated there was a pistol in the car, which Grant stated belonged to Carrywater, but denied there were drugs or other contraband in the vehicle. Sergeant Roberge asked Grant: "I just want to make sure nothing's being trafficked, make sure the pistol's legit. Do you mind if I check your vehicle really quick and get you on your way?" Grant consented to the search.

¶8    Sergeant Roberge conducted a pat-down search of both men outside of the vehicle before searching the car. Grant had about $3,000 in cash and a small bag of homegrown marijuana in his pockets. Sergeant Roberge immediately located the gun under the driver's seat, and after searching the driver's side door moved to the car's center console where he discovered a baggie, which field tested positive for methamphetamine, a handful of pills, and a marijuana pipe. Additional officers arrived on scene and both men were arrested.

4

¶9 On May 13, 2019, the State filed an Information charging Carrywater with the following: Count I: Criminal Possession of Dangerous Drugs, a felony, in violation of § 45-9-102, MCA; and Count II: Use or Possession of Property Subject to Criminal Forfeiture, a felony, in violation of § 45-9-206, MCA. Carrywater moved to suppress the evidence obtained after Sergeant Roberge confirmed that Grant was not the driver, claiming law enforcement exceeded the scope of the lawful traffic stop by asking for Carrywater's license and then questioning him behind the car after learning it was valid.

¶10 The District Court held an evidentiary hearing on December 10, 2019. On February 3, 2020, the District Court denied Carrywater's motion, holding that under the totality of the circumstances, Sergeant Roberge lawfully escalated his investigation from a traffic stop to an investigation of other criminal activity. On April 27, 2020, Carrywater pled guilty to both charges, reserving his right to appeal the court's denial of his motion to suppress.

## STANDARDS OF REVIEW

¶11 We review a district court's ruling on a motion to suppress evidence to determine whether the court's findings of fact are clearly erroneous and whether those findings were correctly applied as a matter of law. *State v. Wilson*, 2018 MT 268, ¶ 21, 393 Mont. 238, 430 P.3d 77. A finding is clearly erroneous if it is not supported by substantial credible evidence, if the trial court misapprehended the effect of the evidence, or if our review of the record leaves us with the firm or definite conviction that the trial court made a mistake. *State v. Harning*, 2022 MT 61, ¶ 13, 408 Mont. 140, 507 P.3d 145.

**DISCUSSION**

*Whether Sergeant Roberge had particularized suspicion to justify extending the traffic stop into a drug investigation.*

¶12 The Fourth Amendment to the United States Constitution and Article II, Section 11, of the Montana Constitution protect Montana citizens from unreasonable searches and seizures by the government. *State v. Graham*, 2007 MT 358, ¶ 12, 340 Mont. 366, 175 P.3d 885. A law enforcement traffic stop is a seizure subject to constitutional scrutiny. *State v. Hoover*, 2017 MT 236, ¶ 15, 388 Mont. 533, 402 P.3d 1224. Evidence obtained as the result of a constitutionally invalid search or seizure is generally inadmissible against the accused in subsequent proceedings. Section 46-13-302, MCA; *State v. Laster*, 2021 MT 269, ¶ 35, 406 Mont. 60, 497 P.3d 224.

¶13 The government's "interest in effective law enforcement demands that officers in the field have some latitude to reach, follow up on, and confirm or dispel initial suspicions of criminal activity." *Hoover*, ¶ 23 (internal quotations and citation omitted). A peace officer may conduct an investigatory stop of "any person or vehicle that is observed in circumstances that create a particularized suspicion that the person or occupant of the vehicle has committed, is committing, or is about to commit an offense." Section 46-5-401(1), MCA. A peace officer who has lawfully stopped a person or vehicle may request the person's name and present address and an explanation of the person's actions and, if the person is the driver of a vehicle, demand the person's driver's license and the vehicle's registration and proof of insurance. Section 46-5-401(2)(a), MCA.

6

¶14 Whether particularized suspicion justifies an investigative stop is a question of fact that the district court determines based on the totality of the circumstances, including the quantity, or content, of the information available to the officer at the time of the investigative stop, and its quality, or degree of reliability. *State v. Kaufman*, 2002 MT 294, ¶ 11, 313 Mont. 1, 59 P.3d 1166; *State v. Elison*, 2000 MT 288, ¶ 16, 302 Mont. 228, 14 P.3d 456 (citing *State v. Pratt*, 286 Mont. 156, 161, 951 P.2d 37, 40 (1997)). The State carries the burden of proof in asserting that law enforcement had the requisite particularized suspicion. *Pratt*, 286 Mont. at 161, 951 P.2d at 40.

¶15 Particularized suspicion requires the officer to articulate "more than a mere generalized suspicion or an undeveloped hunch of criminal activity." *Wilson*, ¶ 28. An officer may temporarily detain a person for investigative purposes without probable cause for an arrest only if, "based on specific and articulable facts known to the officer, including rational inferences therefrom based on the officer's training and experience, the officer has an objectively reasonable, particularized suspicion that the person is engaged, or about to engage, in criminal activity." *Hoover*, ¶ 17 (emphasis removed from original). "When the only basis for suspecting a specific person of wrongdoing is inferences that could be drawn from the conduct of virtually any law-abiding person, the resulting suspicion cannot, by definition, be particularized." *State v. Reeves*, 2019 MT 151, ¶ 13, 396 Mont. 230, 444 P.3d 394. Attaching "inferences of nefariousness," based on nothing more than inarticulable hunches, "subject[s] drivers to the perils of profiling and other impermissible motives for initiating traffic stops." *Reeves*, ¶ 13.

7

¶16 Carrywater concedes that Sergeant Roberge had adequate particularized suspicion to initiate a traffic stop of Grant's car based on the active warrant tied to Grant's vehicle registration and his observations of Grant driving with a suspended driver's license. Carrywater argues that Sergeant Roberge lacked reasonable justification to extend the initial stop into a criminal investigation once he learned Grant's warrant was non-extraditable and that Grant was no longer the driver of the vehicle. Carrywater asserts that § 46-5-401(2)(a), MCA, authorized Sergeant Roberge to demand only *Grant's* license, because *Grant* was the "person" that Sergeant Roberge observed committing the offense of driving with a suspended license, not Carrywater. The State admits that Sergeant Roberge's first basis for initiating the traffic stop, the non-extraditable warrant, was completely quelled before he ever made contact with the vehicle. The State argues that because Grant's invalid license remained a legitimate reason to stop Grant's vehicle, Sergeant Roberge was lawfully permitted to request Carrywater's license and question the vehicle's occupants.

¶17 A traffic stop generally "may not last longer than is necessary to effectuate the purpose of the stop," § 46-5-403, MCA, and its scope "must be strictly tied to and justified by the circumstances which rendered its initiation permissible." *Terry v. Ohio*, 392 U.S. 1, 19, 88 S. Ct. 1868, 1878 (1968); *State v. Anders*, 2012 MT 62, ¶ 14, 364 Mont. 316, 274 P.3d 720 ("a warrantless search must be strictly circumscribed by the exigencies which justify its initiation" (internal citations and quotations omitted)). An officer's justification for an investigative stop may change as he acquires new or additional information. *Wilson*, ¶ 25. Accordingly, an investigative stop may permissibly ripen into broader particularized

8

suspicion of criminal activity so long as "sufficient particularized suspicion of criminal activity existed at the start and continues to exist prior to the development of the additional information on which an officer relies to expand its duration or scope." *Laster*, ¶ 14 (citing *Hulse v. State*, 1998 MT 108, ¶ 40, 289 Mont. 1, 961 P.2d 75).

¶18     In *Wilson*, we held that a patrolman lacked particularized suspicion to expand a valid traffic stop into a drug investigation based on the nervousness of the vehicle's occupants, the borrowed and messy vehicle, a "bizarre" travel story, and the driver's prior drug history. ¶¶ 31-33.   We concluded the patrolman failed to identify objectively incriminating behavior to meet the minimum threshold for particularized suspicion, finding his indicators, as articulated, revealed only a generalized hunch of wrongdoing. *Wilson*, ¶ 34.

¶19     More recently, in *Harning*, we concluded an officer lacked particularized suspicion to extend a lawful traffic stop into a drug investigation where the officer observed the odor of marijuana and Harning, the driver, admitted to having smoked marijuana in a location approximately 80 miles prior to the stop. ¶ 5.  After the officer administered a field sobriety test and confirmed Harning was not impaired, Harning denied having drugs and declined to give consent to a vehicle search. *Harning*, ¶ 8.  Nonetheless, the officer requested a canine sniff, informing Harning that he was beginning a drug investigation and justifying the extension because "just subtle kind of things" led him to believe that Harning was being "evasive." *Harning*, ¶¶ 9, 20.  We determined that "[o]nce any suspicion of DUI was dispelled and no facts warranted additional investigation, Harning should have been released" because the officer "failed to articulate, beyond a circular definition of 'just

9

subtle kind of things' about Harning's 'evasive behavior,' how he came to suspect Harning had drugs in his vehicle." *Harning*, ¶ 20.

¶20 On the other hand, in *State v. Estes*, we held that the officer's suspicion of narcotics activity was appropriately particularized after he approached the car and immediately observed two cell phones and cash in the console; food wrappers and energy drink bottles strewn about the car, and a sleeping bag in the back seat covering a cardboard box, "signs the occupant of the vehicle wanted to get from point A to point B quickly"; an overwhelming odor from multiple air fresheners, "which are often used to mask illicit drug odors"; and the driver appeared nervous and shaking. 2017 MT 226, ¶¶ 3, 18, 388 Mont. 491, 403 P.3d 1249.

¶21 In this case, the State attempts to distinguish *Wilson* because Sergeant Roberge was aware of prior "drug-related concerns" with both Grant and Carrywater, stemming from his time with the Fort Belknap Police Department more than two years earlier; the pair's brief, late-night trip to the E Z Mark being inherently suspicious; and the fact that Sergeant Roberge requested to search the vehicle only 11 minutes after his initial contact, as opposed to the 45-minute delay for a canine search at issue in *Wilson*.

¶22 The purpose of the initial traffic stop of Grant's vehicle was either to arrest Grant on the outstanding warrant or to cite him for driving without a valid license. As the target of the stop, § 46-5-401(1), MCA, authorized law enforcement to investigate Grant for those offenses—only the second of which was potentially supported by particularized suspicion by the time Sergeant Roberge actually made contact with the vehicle's occupants. Sergeant

Roberge declined to effectuate either purpose when he learned the warrant was non-extraditable and Carrywater was the driver of the vehicle.

¶23 Had Grant been the driver of the vehicle, § 46-5-401(2)(a), MCA, would have authorized Sergeant Roberge to demand *Grant's* driver's license and the vehicle's registration and proof of insurance. However, Grant was not the driver, and Sergeant Roberge had not observed Carrywater commit a traffic offense.

¶24 When Sergeant Roberge asked for Carrywater's driver's license, he extended the duration and scope of the traffic stop. To permissibly extend it, Sergeant Roberge needed objectively reasonable, particularized suspicion that Carrywater was engaged, or about to engage, in criminal activity. *Hoover*, ¶ 17. He had none.

¶25 After learning that Grant was no longer driving and Carrywater's license was valid, Sergeant Roberge testified his "reason for remaining on the stop was at some point and time they switched drivers." That fact, combined with the pair's apparent nervousness and Carrywater's protruding jaw, caused Sergeant Roberge "concern," prompting him to expand the scope of the stop by questioning Carrywater at the rear of the car. Yet, none of Sergeant Roberge's initial observations were "objectively indicative of illegal drug activity." *Wilson*, ¶ 35.

¶26 Switching drivers is not a criminal offense, Sergeant Roberge conceded that a protruding jaw is not indicative of active meth use, and as this Court has recognized, "many law-abiding citizens may well be nervous when their activities are being watched by law enforcement officers." *State v. Broken Rope*, 278 Mont. 427, 432, 925 P.2d 1157, 1160 (1996). Unlike the facts in *Estes*, where the driver's disheveled car and other specific

11

observations by the officer provided both quantitatively and qualitatively strong indicators of criminal activity, Sergeant Roberge articulated no objective facts that indicated anyone in Grant's vehicle was using or trafficking drugs. *Harning*, ¶ 28 (In meeting its burden of demonstrating an officer's particularized suspicion, the State must demonstrate more than "just subtle kind of things."). Sergeant Roberge's stated concerns were "not the building blocks of particularized suspicion," but inferences based on inarticulable hunches attaching nefariousness to conduct entirely consistent with a law-abiding person. *Reeves*, ¶¶ 13, 22.

**CONCLUSION**

¶27 Sergeant Roberge did not have the requisite particularized suspicion to expand the scope of the traffic stop into a criminal investigation. Because there were no objectively incriminating facts to establish particularized suspicion once Sergeant Roberge's initial suspicions of Grant's wrongdoings were dispelled, the investigation should have ended with, at most, a citation to Grant for driving without a license earlier that night, or a warning for him to not do so again in the future. We reverse the District Court's denial of Carrywater's motion to suppress and remand to the District Court to vacate Carrywater's conviction and dismiss with prejudice the charges against him.

/S/ JAMES JEREMIAH SHEA

We Concur:

/S/ MIKE McGRATH
/S/ LAURIE McKINNON
/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR